1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ALBERTO SANCHEZ,                    No.  2:13-cv-0491-TLN-EFB P

12              Petitioner,

13         vs.                           FINDINGS AND RECOMMENDATIONS

14   DANIEL PARAMO,

15              Respondent.

16

17         Petitioner Alberto Sanchez is a state prisoner proceeding through counsel with a petition

18   for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a judgment of conviction

19   entered against him on June 4, 2008 in the Yolo County Superior Court on charges of two counts

20   of forcible rape, two counts of rape in concert, and one count each of kidnapping, assault, false

21   imprisonment, and sexual battery, with a finding that the rape and rape in concert offenses were

22   committed under circumstances involving a kidnapping and movement of the victim which

23   substantially increased her risk of harm.  Petitioner seeks federal habeas relief on the following

24   alleged grounds: (1) his constitutional rights were violated by the prosecutor's improper use of

25   peremptory challenges to exclude five Hispanics from the jury; (2) the evidence introduced at his

26   trial is insufficient to support his conviction on the kidnapping charge; (3) jury instruction error

27   violated his right to due process; and (4) the denial of his motion for a separate trial and the

28   admission into evidence at a joint trial of his co-defendants' statements to police violated his

1

1  federal constitutional rights.  Upon careful consideration of the record and the applicable law and

2  for the reasons stated below, it is recommended that petitioner's application for habeas corpus

3  relief be denied.

4  **I. Background**

5       In its unpublished memorandum and opinion affirming petitioner's judgment of

6  conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

7  following factual summary:

> Defendants, Alberto Sanchez (Alberto), Israel Sanchez (Israel) and
> Edgar Radillo (Edgar), picked up a young woman and drove her to
> a remote location in Yolo County where they sexually assaulted
> her.  All three were convicted by a jury of two counts each of
> forcible rape (Pen.Code, § 261, subd. (a)(2)) and rape in concert (*id.*
> § 264.1) and one count each of assault ( *id.* § 245, subd. (a)(1)),
> false imprisonment (*id.* §§ 236 and 237, subd. (a)) and sexual
> battery (*id.* § 243.4, subd. (a)).  (Further undesignated section
> references are to the Penal Code.)  In addition, Alberto and Israel
> were convicted of kidnapping (§ 207, subd. (a)), while Edgar was
> found guilty of the lesser included offense of false imprisonment.
> Finally, the jury found as to Alberto and Israel that the rape and
> rape in concert offenses had been committed under circumstances
> involving a kidnapping and movement of the victim which
> substantially increased her risk of harm (§ 667.61).
>
> Alberto and Israel were sentenced to an aggregate determinate term
> of five years plus a consecutive indeterminate term of 25 years to
> life.  Edgar received an aggregate determinate term of 23 years, 8
> months.
>
> * * *
>
> The People correctly concede Alberto's two rape convictions
> (counts 2 and 4) and the false imprisonment convictions (count 7)
> of Israel and Alberto must be vacated.  We thus accept those
> concessions.  We also conclude Edgar's conviction for the lesser
> included offense of false imprisonment on count 1 must be
> dismissed in light of his conviction for the same offense on count 7.
> In all other respects, we affirm the judgments.
>
> **Facts and Proceedings**
>
> On the evening of August 11, 2006, 16–year–old Antonio S. met
> Edgar and Alberto at a school in Dixon and the three smoked
> marijuana.  Later, Israel joined them and the four departed in
> Israel's 4–door Acura.  They drove around Dixon for a while and
> then headed for Davis.  Antonio and Edgar continued to smoke
> marijuana in the back seat of the car.  At some point during their
> drive around Davis, they stopped for gas and Antonio purchased a
> bag of Doritos.  They then continued their cruise past the local bars.

2

That same evening, 23–year–old S.L. and some friends went out for a night of dinner and drinking in downtown Davis.   At approximately 11:00 p.m., S.L. left her friends and went to another bar to meet someone.  She left that bar at around 1:00 or 1:30 a.m. She was intoxicated, tired and wanted to go home.  However, her ride for the evening had already gone home.

S.L. started walking down the street and thinking how she might get home.  Just then, Israel and the others drove by.  They stopped and asked if S.L. was alright and if she needed help.  S.L. said she wanted to go home and they offered to take her there.   S.L. accepted the offer and told them she lived off Covell and Alvarado in Davis.  She got in the back of the car between Antonio and Edgar and instructed them to take Highway 113 and exit at Covell.  She repeated that she just wanted to go home.  They agreed to take her home.

A couple of minutes after S.L. got into the car, the men began passing around a marijuana cigar to smoke.  They offered it to S.L. and she took a puff.  Israel proceeded onto Highway 113 but did not take the Covell exit.  As they drove, Antonio began touching S.L.'s leg and she told him to stop and pushed his hand away.   She repeated that she just wanted to go home.

As they drove away from Davis, S.L. asked where they were going, but nobody responded.  They eventually arrived at a remote area and drove up a dirt driveway.  Israel turned off the car and the car lights.

What happened thereafter is less certain.  Both S.L. and Antonio testified at trial and described different versions.  According to S.L., the four men got out of the car and ordered her out.  She refused, and one of them yelled at her to get out.  She got out of the car and began to cry.  S.L. pleaded, "Please don't do this.  Please don't.  I beg you, please stop.  Don't do this to me."  One of the men pushed S.L. onto the ground near the car and then someone got on top of her while the others stood around them in a circle.  The man on top of S.L. told her to take off her skirt.  She refused, and he took it off for her, along with her underpants.  S.L. then heard cheering and laughing and "abrela, abrela," which means open.   S.L. began moving around trying to get the man off of her and he punched her in the left eye.  He then penetrated her vagina with his penis.  The man remained on top of S.L. for five to seven minutes and then told her not to tell anyone.

According to S.L., after the first man got off her another took his place.  He too penetrated her vagina with his penis.  This man pulled down her shirt and bra and squeezed her left breast "very hard."   After this man got off S.L., the men kicked her in the stomach and neck.  She laid there until she heard the car engine start and heard them drive away.

Antonio testified pursuant to a plea deal whereby he was permitted to plead guilty to two felonies with no particular promise as to sentencing.  According to Antonio, after they arrived at the remote

3

location, S.L. said she was going to be sick and she and Edgar got out of the car.   Israel and Alberto also got out, but Antonio remained in the car.   Edgar held S.L. while she vomited.   Israel eventually walked over to them and took over holding S.L. Meanwhile, Alberto took S.L.'s purse out of the car and emptied it on the trunk.   He found condoms inside.

According to Antonio, Alberto and Edgar eventually joined Israel and together they removed S.L.'s clothes.   Israel and Alberto then walked S.L. over to a grassy area and laid her down.   Alberto threw Israel a condom taken from S.L.'s purse.   Israel got on top of S.L. and had sexual intercourse with her.   According to Antonio, S.L. did not appear to be a willing participant.   He heard her moaning and yelling "no" and "stop."   After Israel finished, he asked, "Who is next?"   Alberto gave Edgar another condom from S.L.'s purse and Edgar got on top of S.L. and had sexual intercourse with her.

At some point during the foregoing, Antonio got out of the car and smoked a cigarette.   He also discarded the empty Doritos bag he had obtained at the gas station.   By the time Edgar finished with S.L., Antonio was back in the car.   After Edgar rejoined the others at the car, they got in and started to drive away.   However, at the end of the driveway, Alberto told Israel to stop the car.   Alberto got out and was gone four to five minutes.   When he returned, he told them he had beaten S.L. up.   On the way home, the others instructed Antonio not to say anything about what happened.

After the men left, S.L. blacked out for a short period.   When she awoke, her stomach hurt and she was cold.   She got up and started running from the area for fear that the men might return.   In the distance, she saw the lights of a city and moved in that direction. She was wearing only her top and shoes.   S.L. was eventually discovered by police officers at 4:45 a.m. walking along County Road 102.   She appeared injured, stated that she had been raped and pointed in the direction of where it had occurred.   She informed the officers that the rest of her clothes and her purse were still at the scene.

Officers eventually located the crime scene and found S.L.'s clothes and purse.   They also found an empty Doritos bag, a condom wrapper, two condoms, and a receipt from one of the bars where S.L. had been that evening.   They located an area where the grass appeared to be pressed down as if someone had been lying on it.

A fingerprint lifted from the Doritos bag was determined to be a match to one on file for Antonio.   On August 25, officers served a search warrant at Antonio's home.   They picked up Antonio and took him in for questioning.   Antonio admitted picking up S.L. that evening and indicated three others had been involved.   He identified one of the participants as Alberto Sanchez but provided only first names, Edgar and Israel, for the other two.

Officers later picked up Alberto, Edgar and Israel and brought them in for questioning.   DNA from one of the condoms found at the

4

scene was later determined to be a match for Edgar, and DNA from the other condom was found to be a match for Israel.

Alberto testified at trial. He admitted picking up S.L. in the early morning hours of August 12, 2006, and taking her to a remote location. According to Alberto, after they arrived at the scene, he walked over to a gate at the entrance to the driveway and remained there until they departed 15 minutes later. He claimed not to have heard or seen anything that was done by the others with S.L.

As noted previously, Antonio was given a plea deal and testified for the prosecution. The other three were charged with kidnapping (count 1), two counts of rape (counts 2 and 4), two counts of rape in concert (counts 3 and 5), assault (count 6), false imprisonment (count 7), and sexual battery (count 8). They were also charged with enhancements on the rape and rape in concert charges for having kidnapped the victim and having moved her so as to substantially increase her risk of harm.

Israel and Alberto were convicted as charged. Edgar was found guilty on all charges except kidnapping, for which he was instead convicted of the lesser included offense of false imprisonment. The jury also found not true as to Edgar all of the enhancements on the rape and rape in concert charges.

Alberto was sentenced on the assault charge (count 6) to the upper term of four years and on the sexual battery charge (count 8) to a consecutive one-third the middle term of one year, for an aggregate determinate sentence of five years. In addition, Alberto received a consecutive indeterminate term of 25 years to life for one rape in concert charge (count 3) and an identical term to run concurrently on the other rape in concert charge (count 5). Sentence on the remaining counts was stayed pursuant to section 654. Alberto received credit for time served of 356 days plus 53 days of conduct credits, for a total of 409 days.

Israel received the same sentence as Alberto, except instead of staying sentence on the rape charges (counts 2 and 4), the court struck those charges. Israel received credit for time served of 346 days plus 51 days conduct credits, for a total of 397 days.

*People v. Sanchez*, No. C059763, 2011 WL 3806264, at **1-4 (Cal.App. 3 Dist. Aug. 30, 2011).

After the California Court of Appeal affirmed petitioner's judgment of conviction, he filed a petition for review in the California Supreme Court. Resp't's Lodg. Doc. 12. Therein, petitioner raised all of the claims that he raises in the petition before this court. *Id.* The petition for review was summarily denied. Resp't's Lodg. Doc. 14.

On March 11, 2013, petitioner filed a petition for writ of habeas corpus in this court.

/////

## II.  Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S. ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

be accepted as correct. *Id.* Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. [1] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,131 S. Ct. at 786-87.

/////

---

[1] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1    If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

2    court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

3    527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

4    (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

5    2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

6    de novo the constitutional issues raised.").

7    The court looks to the last reasoned state court decision as the basis for the state court

8    judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If

9    the last reasoned state court decision adopts or substantially incorporates the reasoning from a

10    previous state court decision, this court may consider both decisions to ascertain the reasoning of

11    the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When

12    a federal claim has been presented to a state court and the state court has denied relief, it may be

13    presumed that the state court adjudicated the claim on the merits in the absence of any indication

14    or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85. This

15    presumption may be overcome by a showing "there is reason to think some other explanation for

16    the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

17    803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims

18    but does not expressly address a federal claim, a federal habeas court must presume, subject to

19    rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___,

20    ___, 133 S.Ct. 1088, 1091 (2013).

21    Where the state court reaches a decision on the merits but provides no reasoning to

22    support its conclusion, a federal habeas court independently reviews the record to determine

23    whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v.

24    Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

25    review of the constitutional issue, but rather, the only method by which we can determine whether

26    a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no

27    reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

28    reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief."  *Richter*, 131 S. Ct. at 784.  This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  *Id.* at 786.  The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 131 S. Ct. at 784).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

## III. Petitioner's Claims

### A. Improper Use of Peremptory Challenges

Petitioner claims in his first ground for relief that his constitutional rights were violated by the prosecutor's improper use of peremptory challenges to exclude five Hispanics from the jury. ECF No. 1-1 at 42-87.[2]

#### 1. State Court Decision

In a lengthy and thorough opinion, the California Court of Appeal described the background to this claim and its ruling thereon.  With citation to *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*), it accurately recited the governing law.  It noted that after the prosecution exercised its first five peremptory challenges on jurors who self-identified as Hispanic, each defendant raised a *Wheeler/Batson* challenge and that the prosecution responded with various nondiscriminatory reasons for the

---

[2] Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

peremptory challenges, and the trial court rejected the challenge without prejudice to renewal at a later time.  The state appellate court observed that "[i]t is well settled that '[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias – that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds' ... violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution."  *Sanchez*, 2011 WL 3806264, at *5.  In applying *Batson* to this record, the state appellate court explained its reasoning as follows:

> A *Wheeler/Batson* challenge involves a three-step process. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race.  Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason.  Third, the court determines whether the defendant has proven purposeful discrimination.  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.  [Citation.]"  (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613.)

> Where, as here, the trial court makes no specific finding on whether the defendant made the required prima facie showing and the prosecutor explains the basis for her challenge, we proceed to the second and third steps of the process.  (*People v. Cowan* (2010) 50 Cal.4th 401, 448.)

> "A prosecutor asked to explain his conduct must provide a '"clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.'  [Citation.]  'The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice.'  [Citation .]  A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons.  [Citations.]  Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection.  [Citation.]  Certainly a challenge based on racial prejudice would not be supported by a legitimate reason."  (*People v. Lenix, supra*, 44 Cal.4th at p. 613.)

> On direct review, the *Batson/Wheeler* issue "turns largely on an 'evaluation of credibility.'  [Citation.]  The trial court's determination is entitled to 'great deference,' [citation], and 'must be sustained unless it is clearly erroneous,' [citation]."  (*Felkner v. Jackson* (2011) 562 U.S. —— .)

> "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.]  In assessing credibility,

the court draws upon its contemporaneous observations of the voir dire.  It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her.  [Citation.]"   (*People v. Lenix, supra*, 44 Cal.4th at p. 613, fn. omitted.)

"The proper focus of a *Batson/Wheeler* inquiry is on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, not on the objective reasonableness of those reasons.  [Citation.]   What matters is that the prosecutor's reason for exercising the peremptory challenge is legitimate.  A '"legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection.   [Citations.]'   [Citation.]"   (*People v. Hamilton, supra*, 45 Cal.4th at p. 903.)

**Prospective Juror Danielle A.**

The prosecutor exercised her first peremptory challenge on Danielle A.  During the *Wheeler/Batson* hearing, the prosecutor explained she did not feel comfortable having Danielle on the jury because "she herself and her husband have been accused and arrested for drug offenses."  In her questionnaire, Danielle had answered "yes" to the question: "Have you, a close friend, or relative ever been ACCUSED or ARRESTED for a crime, even if the case did not come to court?"  Danielle further indicated the individuals involved had been herself, her husband and her son and that there had been no trial.  Danielle identified the crimes as "drug possession various traffic ect. [sic]."  In response to the question "What happened?" Danielle indicated: "probation, jail time, fines ect [sic]."  Finally, in response to the question, "How do you feel about what happened?" Danielle answered: "Things happened the way they should have[.] [Y]ou do something then you deserve the consequences of your actions."

During voir dire, the court questioned Danielle A. about the prior offenses as follows:

"Q. Now, you make reference in one of the questions to the situation involving yourself, your husband and your son.  Were any charges ever filed in that respect?

"A. Traffic, a few, but—

"Q. No felonies or misdemeanors?

"A. Yes, there were."

At the *Wheeler/Batson* hearing, the trial judge acknowledged that perhaps he should have been more assertive in questioning her about the prior offenses but he "didn't want to embarrass her."

Defendants contend the prosecution had insufficient information about the prior offenses to use them as a basis for excusing the potential juror.  They point out there was no information about the

age of the offenses, where they occurred, whether there was a conviction, or whether they involved misdemeanors or felonies. They argue it is uncertain whether Danielle A., her husband or her son had been the one involved in the drug offense. Defendants further argue the prosecutor failed to question the juror about the offenses, thereby demonstrating this was not the motivating factor for her challenge.

The People acknowledge that the exact nature of the charges against Danielle A. and/or her husband and son is not revealed by the record but argue the prosecutor need not question a potential juror if the prosecutor already has enough information to make a decision on whether to allow the person to remain on the jury.

The People have the better argument. "A prospective juror's negative experience with the criminal justice system, including arrest, is a legitimate, race-neutral reason for excusing the juror." (*People v. Cowan, supra*, 50 Cal.4th at p. 450.) This is true whether it is the juror herself or a family member who was involved. (*See ibid.*) And while the age of the offense and whether it was a misdemeanor or a felony may be relevant considerations, they are not determinative. Hence, while a failure to engage in meaningful voir dire can in some important circumstances, be circumstantial evidence suggesting pretext (*People v. Lomax* (2010) 49 Cal.4th 530, 573), we agree with the People it was not necessary in this instance for the prosecution to ascertain the details of the prior offenses of Danielle A. or her family in order to use this as a legitimate basis for a peremptory challenge.

Defendants argue the pretextual nature of the prosecutor's stated rationale is revealed in her failure to challenge two similarly situated non-Hispanic jurors, Jurors No. 1 and 11. "'If a prosecutor's proffered reason for striking a [Hispanic] panelist applies just as well to an otherwise-similar [non-Hispanic] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered'" in the third step of the *Wheeler/Batson* analysis. (*People v. Lomax, supra*, 49 Cal.4th at pp. 571–572.) In this instance, Juror No. 1's father had been accused of sexual misconduct, and Juror No. 11 had received a speeding ticket "for no reason."

The People counter that Jurors No. 1 and 11 were not similarly situated to Danielle A., because elsewhere in their questionnaires they demonstrated a pro-prosecution or pro-victim bias. Juror No. 11 stated the following about the crimes charged in the instant case: "Rape is a very serious and terrible crime that should be punished fully." He also indicated a friend had previously been raped, but no charges had been filed and expressed a belief that rape is an underreported crime because of fear. Juror No. 1 disclosed that he had been a victim of sexual assault throughout his childhood, but no charges had ever been filed.

Again, we agree with the People. While Juror No. 1's father may have been accused of sexual misconduct, it also appears Juror No. 1 may have been the victim. Thus, he can hardly be considered one

12

who believes his family may have been unjustly accused. And while Juror No. 11 did indicate he had been unjustly accused of speeding, he also demonstrated affinity to victims of the crimes charged in this matter. Thus, he too was not necessarily one who would have a bias against law enforcement.

The record supports a race-neutral basis for the prosecutor's challenge of Danielle A.

**Prospective Juror Carlos H.**

The prosecutor exercised her second peremptory challenge on potential Juror Carlos H. The prosecutor based this challenge on the following factors: (1) as a teenager, Carlos had been kicked off of a ladder by a border patrol officer who was chasing illegal aliens; (2) Carlos had a bad experience with law enforcement in the resolution of a case where his grandson was the victim; (3) Carlos's uncle had been accused of and arrested for drug addiction; (4) Carlos believes some additional evidence is needed to support the testimony of a witness; and (5) Carlos's brother was accused of sexual assault. Each of these factors is supported by Carlos's questionnaire responses.

Defendants argue the incident with the ladder, which occurred 42 years earlier, cannot serve as a valid basis for challenging the potential juror and the factor involving the grandson as a victim actually cuts against the defense, not the prosecution. They further argue the prosecutor's failure to question Carlos H. about any of these factors reveals their pretextual nature. Finally, defendants argue the prosecutor failed to challenge similarly situated jurors who had had negative experiences with law enforcement or expressed a belief that additional evidence is necessary to corroborate the testimony of a witness.

Given the many factors cited by the prosecutor, she cannot be faulted for failing to question the potential juror. There was certainly enough from the questionnaire alone to support the challenge. As for the age of the ladder incident, this merely goes to the weight of the factor. And while the fact the potential juror's grandson was the victim of an unsolved robbery may have biased him against criminal defendants in general, the prosecutor was free to surmise this would also bias him against law enforcement who failed to solve the crime. Finally, as to similarly-situated jurors, defendants point to none who have the same or similar combination of factors as Carlos H. Thus, there were no similarly-situated jurors.

The record supports the prosecutor's peremptory challenge of Carlos H.

**Prospective Juror Sarah H.**

The prosecution's next challenge was to Sarah H. The prosecutor cited two factors supporting that challenge: (1) Sarah had had a negative experience with law enforcement; and (2) she had once

been arrested for assault and had been required to convince the judge of her innocence.

In her questionnaire, Sarah H. answered "yes" to the question whether she ever had a particularly bad experience with law enforcement officials. She explained: "A police officer, without his lights on, ran a red light in Davis and almost hit me while I was in the intersection. He then tried to pull me over and give me a speeding ticket when I was not speeding. He let me go after seeing I was not alone in my vehicle and I demanded his badge number." Elsewhere in the questionnaire, Sarah indicated that, in 2004, she had been accused or arrested for assault by an ex-girlfriend and "had to prove [her] innocence and try to convince the judge that [the ex-girlfriend] had fabricated the story." As to how she felt about this experience, Sarah explained: "I feel that anyone can be accused of something they didn't do and are treated like a criminal even when the police report states otherwise."

Defendants contend the two grounds mentioned by the prosecutor, although supported by the questionnaire responses, were not in fact what motivated the challenge. They point to the fact the prosecutor failed to ask Sarah H. any questions about these two items and failed to challenge other jurors who had had negative experiences with law enforcement. In addition, defendants point out "the prosecutor completely ignored other significant grounds which were likely sufficient to support a challenge for cause . . . ." For example, Sarah indicated in her questionnaire that she "can never say someone is guilty unless [she has] personally witnessed them commit the crime." She expressed a belief "that law enforcement operates by racial profiling" and indicated she did not believe she could be "open minded to judging a stranger." According to defendants, the prosecutor's failure to mention these other potential grounds for challenge "is consistent with the conclusion that the strike was motivated by a discriminatory purpose rather than an assessment of the relevant characteristics of the prospective juror."

As discussed above, the fact the prosecutor did not also challenge Jurors No. 1 and 11, who had had negative experiences with law enforcement, does not render the prosecutor's use of this factor in challenging Sarah H. suspect. Those other jurors had other questionnaire responses that suggested a pro-prosecution or pro-victim bias. And as for the prosecutor's failure to question Sarah, such questioning is unnecessary if the questionnaire response provides sufficient information. Sarah was fairly clear in her questionnaire responses regarding the nature of the prior incidents.

As for the prosecutor's failure to mention other valid grounds for excusing Sarah H., we note that the hearing on defendants' *Wheeler/Batson* motion took place the morning after the prosecutor made the various peremptory challenges at issue here. When asked to comment on the basis for the challenges, the prosecutor began: "It might take me a minute because I took out this morning all of my Post–It notes in all the areas in justifying these particular areas." In other words, the prosecutor no longer had the notes she used the day before to assist her in deciding who to challenge. Therefore, it

is not surprising that the prosecutor might not recall all of the grounds she used to warrant each of the challenges, and no particular inference should be drawn from this circumstance.

We conclude the record supports the prosecutor's peremptory challenge of Sarah H.

**Prospective Juror Maria C.**

The next potential juror to be challenged by the prosecution was Maria C.  The prosecutor explained she was concerned with Maria's response to a question about aider and abettor liability.  That question asked: "The law says that someone who aids or abets a crime is equally liable for having committed that offense.  Is there anyone who has a problem with the concept of law that holds someone who aids, facilitates, promotes, encourages, or instigates a crime is equally liable for having committed that crime?"  Maria answered "yes" and explained: "[T]hey can be lying and blaming someone else."

During voir dire, the prosecutor questioned Maria C. about this questionnaire response as follows:

"Ms. [C.], with regard to your questions on aiding and abetting, you indicated that you do have a problem with the concept that somebody who aids and abets a crime as being each legally liable for that crime.  Is that a fair reading of your answer?

"A. I am not sure.  I didn't understand that question really.

"Q. If the law were to tell you that helping or promoting or encouraging a crime that is committed, you are responsible for that crime that was committed, even if you are not the person who actually committed it.  Do you have a problem with that?

"A.  No.

"Q. And is that with regards to any type of crime or would you compartmentalize?

"In other words, do you know what I mean by that?  Would you follow the law with regards to that?

"A. Yes.

"Q. And would you follow the law on everything?

"A. Yes."

Defendants contend the questionnaire response, when viewed in light of the voir dire answers, does not reflect confusion over the concept of aiding and abetting but confusion over the wording of the question itself and a concern that one defendant may be lying in order to get someone else in trouble.  They further argue Maria C. provided other questionnaire responses that reflect a pro-

prosecution bias, and the prosecutor failed to excuse another potential juror, Henry B., who likewise answered "yes" to the question whether anyone has a problem with aiding and abetting liability.

We agree the wording of the question could have been clearer. Read literally, the question asked whether "anyone" had a problem with aiding and abetting liability.  It may reasonably be assumed there is someone in the world who has a problem with holding an aider and abettor equally liable for a crime.  But it does not appear Maria C. read the question literally.  She expressed a concern that one defendant may point the finger at another to get the other in trouble without any basis in fact.  This, of course, could be a potential concern for the prosecution, which intended to use the testimony of one of the perpetrators against the others.  Thus, Maria's response raised less of a concern about her willingness to hold aiders and abettors equally liable than a concern with her willingness to accept the testimony of a coconspirator.

As for other questionnaire responses that purportedly reveal a pro-prosecution bias, we do not share defendants' interpretation of those responses.  Maria C. answered "yes" to the question whether a police officer's testimony will be more truthful than that of a civilian witness.  She explained: "Sometimes the police either have seen what the civilian done [sic] or has a witness for proof."  Aside from the incoherence of this explanation, it does not appear to reveal a pro-police bias so much as a belief that police may be more truthful simply because they either saw what happened themselves or have a corroborating witness.  In other words, it is not that police officers are more truthful, it is just that they often have more first-hand knowledge.

In response to a question about whether the fact charges have been filed against the defendants causes her to conclude they are more likely guilty than not guilty, Maria C. answered "yes," but explained, "because depending on what that person has done."  This explanation makes no sense in the context and, therefore, provides little or no guidance on the issue.

Maria C. indicated the testimony of one witness would be enough for a conviction, but then followed up by answering "yes" to the question whether she would require additional evidence to corroborate the testimony of a witness.  Likewise, Maria expressed a belief that cases of sexual assault are over-reported but then explained that such cases are nevertheless important and that the law regarding sexual assault "could be a little too weak."  In our view, the foregoing responses do not reveal a pro-prosecution or anti-prosecution bias.

Finally, as to the prosecutor's failure to excuse Henry B., who also answered "yes" to the question about anyone having a problem with aider and abettor liability and explained that "[t]his will very [sic] from case to case," we note that defendants themselves excused

16

Henry B. just before the prosecutor excused Maria C.  Hence, we have no way of knowing if the prosecutor would have challenged Henry B. as well.

We conclude the record supports the prosecutor's peremptory challenge to Maria C.

**Prospective Juror Monica V.**

The last potential juror to be excused by the prosecution before the *Wheeler/Batson* motion was Monica V.  The prosecutor identified the following factors informing her decision: (1) Monica is young; (2) she has no children; (3) a police officer once battered her father; and (4) she believes someone who accepts a ride from strangers is responsible for what happens to them.   According to the questionnaire, Monica was 26 years old and had no children.  She explained the incident with her father as follows: "A police officer battered my dad in Los Angeles . . . he sat my dad in hot the curb [sic] and my dad was wearing shorts my dad slide front [sic] to try to move from the hot curb and the police hit my dad really bad."  She answered "yes" to the question whether she believes one who accepts a ride from a stranger is responsible for whatever happens to them, and explained: "Because you decided to accept the ride so you are responsible if anything happens."

Defendants contend the factors cited by the prosecutor did not in fact motivate the peremptory challenge, inasmuch as the prosecutor failed to challenge non-Hispanic jurors who were young and had no children, had had negative experiences with law enforcement, or indicated that a person who accepts a ride from a stranger is responsible for what happens to them.  However, while it may be true that the prosecutor failed to excuse certain jurors whose questionnaire responses revealed circumstances similar to Monica V. as to age, lack of children, prior experiences with law enforcement, or responsibility of one who accepts a ride from a stranger, defendants cite no juror who had the same combination of these factors.

While comparative juror analysis is certainly relevant in assessing the third step of the *Wheeler/Batson* analysis, "'we are mindful that comparative juror analysis on a cold appellate record has inherent limitations.'  [Citation.]  In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved.  'Two panelists might give a similar answer on a given point.  Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable.  These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor

medium to overturn a trial court's factual finding.'   [Citation.]" (*People v. Taylor* (2009) 47 Cal.4th 850, 887.)

17

> We cannot say on the record before us that the trial court erred in concluding the prosecutor utilized a valid, race-neutral rationale for excusing Monica V. We therefore conclude the trial court did not err in denying defendants' *Wheeler/Batson* motion.

*Sanchez*, 2011 WL 3806264, at **4-12.

## 2. Legal Standards Regarding Petitioner's Batson Claim

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. *See Batson*, 476 U.S. at 79; *Johnson*, 545 U.S. at 62. So-called *Batson* claims are evaluated pursuant to a three-step test:

> First, the movant must make a prima facie showing that the prosecution has engaged in the discriminatory use of a peremptory challenge by demonstrating that the circumstances raise "an inference that the prosecutor used [the challenge] to exclude veniremen from the petit jury on account of their race." [Citation omitted.] Second, if the trial court determines a prima facie case has been established, the burden shifts to the prosecution to articulate a [gender]-neutral explanation for challenging the juror in question. [Citation omitted.] Third, if the prosecution provides such an explanation, the trial court must then rule whether the movant has carried his or her burden of proving the existence of purposeful discrimination.

*Tolbert v. Page*, 182 F.3d 677, 680 (9th Cir. 1999) (en banc).

In order to establish a prima facie case of racial discrimination, petitioner must show that "(1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motived by race." *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006) (citing *Batson*, 476 U.S. at 96 and *Cooperwood v. Cambra*, 245 F.3d 1042, 1045-46 (9th Cir. 2001)). A prima facie case of discrimination "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson*, 545 U.S. at 169 (quoting *Batson*, 476 U.S. at 94.) Both Hispanics and African-Americans constitute cognizable groups for *Batson* purposes. *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir. 2002).

/////

18

At the second step of the *Batson* analysis, "the issue is the facial validity of the prosecutor's explanation." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." *Id.* at 360. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Stubbs v. Gomez*, 189 F.3d 1099, 1105 (9th Cir. 1999) (quoting *Hernandez*, 500 U.S. at 360). For purposes of step two, the prosecutor's explanation need not be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. at 765, 768 (1995). Indeed, "to accept a prosecutor's stated nonracial reasons, the court need not agree with them." *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006).

In the third step of a *Batson* challenge, the trial court has "the duty to determine whether the defendant has established purposeful discrimination," *Batson*, 476 U.S. at 98, and, to that end, must evaluate the "persuasiveness" of the prosecutor's proffered reasons. *See Purkett*, 514 U.S. at 768. In determining whether petitioner has carried this burden, the Supreme Court has stated that "a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Hernandez*, 500 U.S. at 363. "[A]ll of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). *See also Cook v. Lemarque*, 593 F.3d 810, 814 (9th Cir. 2010) (citation and internal quotation marks omitted) (stating the "totality of the relevant facts" should be considered "to decide whether counsel's race-neutral explanation . . . should be believed."). In step three, the court "considers all the evidence to determine whether the actual reason for the strike violated the defendant's equal protection rights." *Yee v. Duncan*, 463 F.3d 893, 899 (9th Cir. 2006).

A prosecutor's reasons for striking a juror may be "founded on nothing more than a trial lawyer's instincts about a prospective juror . . . so long as they are the actual reasons for the prosecutor's actions." *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (quoting *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989)). "Excluding jurors because of their profession, or because they acquitted in a prior case, or because of a poor attitude in answer to

1   voir dire questions is wholly within the prosecutor's prerogative." *United States v. Thompson*,

2   827 F.2d 1254, 1260 (9th Cir. 1987).  It is not improper for a prosecutor to rely on his instincts

3   with respect to the voir dire process.  *See  Power*, 881 F.2d at 740 (quoting *Chinchilla*, 874 F.2d

4   at 699).  In short, instinct and subjective factors have a legitimate role in the jury selection

5   process.  *Miller-El*, 545 U.S. at 252; *Burks*, 27 F.3d at 1429, n.3 ("peremptory strikes are a

6   legitimate means for counsel to act on . . . hunches and suspicions").

7          The defendant in the criminal prosecution bears the burden of persuasion to prove the

8   existence of unlawful discrimination.  *Batson*, 476 U.S. at 93.  "This burden of persuasion 'rests

9   with, and never shifts from, the opponent of the strike.'"  *Johnson*, 545 U.S. at 2417 (quoting

10   *Purkett*, 514 U.S. at 768).

11          "Any constitutional error in jury selection is structural and is not subject to harmless error

12   review."  *Williams v. Runnels*, 640 F.Supp.2d 1203, 1210 (C.D. Cal. 2010) (citing *Windham v.*

13   *Merkle*, 163 F.3d 1092, 1096 (9th Cir. 1998) and *Turner v. Marshall*, 121 F.3d 1248, 1254 n.3

14   (9th Cir. 1997).  *See also Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (stating that among those

15   constitutional rights so basic "that their infraction can never be treated as harmless error" is a

16   defendant's "right to an impartial adjudicator, be it judge or jury") (citation and internal

17   quotations omitted); *Williams v. Woodford*, 396 F.3d 1059, 1072 (9th Cir. 2005) ("because a

18   *Batson* violation is structural error, actual harm is presumed to have resulted from the alleged

19   constitutional violation").

20                        **3.  <u>Analysis</u>**

21          This court need not address the preliminary issue of whether petitioner established a prima

22   facie case of purposeful discrimination because both the state trial and appellate courts ruled on

23   the ultimate question of intentional discrimination under the *Batson* analysis.  *Hernandez*, 500

24   U.S. at 359; *United States v. Gillam*, 167 F.3d 1273, 1278 (9th Cir. 1999).  The trial judge

25   apparently concluded that petitioner established a prima facie case of racial discrimination

26   because he asked the prosecutor to respond to defendants' *Batson* motion.  Reporter's Transcript

27   on Appeal (RT) at 105.  The sole issue before this court, therefore, is whether the California

28   courts unreasonably concluded that petitioner failed to meet his ultimate burden of establishing

1  that the prosecutor's challenges were motivated by racial discrimination under the third step of

2  the *Batson* analysis.

3         In evaluating habeas petitions premised on step three of *Batson*, the standard of review is

4  "doubly deferential: unless the state appellate court was objectively unreasonable in concluding

5  that a trial court's credibility determination was supported by substantial evidence, we must

6  uphold it." *Jamerson v. Runnels,* 713 F.3d 1218, 1225 (9th Cir. 2013) (citations omitted).  This

7  court can only grant petitioner's *Batson* claim "if it was unreasonable to credit the prosecutor's

8  race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338 (2006).

9  In this case, when asked, the prosecutor expressed a neutral, reasonable basis for the use of her

10  peremptory challenges of all five of the Hispanic jurors.  RT at 105-07.  The prosecutor's reasons

11  were "clear and reasonably specific" and were "related to the particular case to be tried." *Purkett*,

12  514 U.S. at 768-69.  They are also supported by the record.  The California Court of Appeal

13  analyzed each juror's answers to the juror questionnaire, the prosecutor's voir dire of each

14  stricken juror, and the characteristics of other similar jurors who were not stricken.  After a

15  thorough comparison, the court concluded that the record supported a race-neutral basis for each

16  strike.  This court has also reviewed the record and agrees with the characterization of the Court

17  of Appeal with respect to the characteristics of the other jurors on the panel who were not stricken

18  by the prosecutor.

19         It is true that the fact one or more of the prosecutor's proffered reasons for striking the

20  Hispanic jurors also applied to other jurors who were not stricken is "evidence tending to prove

21  purposeful discrimination to be considered at *Batson*'s third step." *Miller-El*, 545 U.S. at 241.

22  However, the fact that an excused juror shares one or more characteristics with seated jurors does

23  not end the inquiry nor establish that the prosecutor was acting with discriminatory intent.

24  Rather, the court must evaluate the "totality of the relevant facts" to decide whether "counsel's

25  race-neutral explanation for a peremptory challenge should be believed." *Ali v. Hickman*, 584

26  F.3d 1174, 1180 (9th Cir. 2009).  For the reasons stated by the California Court of Appeal, the

27  similarities between the stricken jurors and several of the seated jurors do not undermine the

28  prosecutor's stated reason for excusing the five Hispanic jurors.

1       This court also notes that petitioner's jury did contain one Hispanic juror, a fact relevant

2   although not decisive.  "The fact that African-American jurors remained on the panel 'may be

3   considered indicative of a nondiscriminatory motive.'"  *Gonzalez v. Brown*, 585 F.3d 1202, 1210

4   (9th Cir. 2009) (quoting *Turner v. Marshall*, 121 F.3d 1248, 1254 (9th Cir. 1997)).  *See also*

5   *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994) (fact that jury contained an African-American

6   member is "a valid, though not necessarily dispositive, consideration in determining whether a

7   prosecutor violated *Batson*").

8       After reviewing the record, this court finds that the state court's disposition of petitioner's

9   *Batson* claim is not contrary to or an unreasonable application of clearly established federal law

10  nor did it result in a decision that is based on an unreasonable determination of the facts in light of

11  the evidence presented in the state court proceeding.  The record reflects that the state trial judge

12  performed an adequate evaluation of the prosecutor's reasons for challenging the Hispanic jurors

13  and appropriately denied petitioner's *Batson/Wheeler* motion.  After a review of the entire

14  relevant record, this court agrees with the state court that the prosecutor's stated reasons for her

15  exclusion of five Hispanic jurors were her genuine reasons for exercising a peremptory strike,

16  rather than a pretext invented to hide purposeful discrimination.  Petitioner has failed to carry his

17  burden of proving the existence of unlawful discrimination with respect to the prosecutor's

18  challenge to these jurors.  Accordingly, he is not entitled to relief on this claim.

19      **B.  Insufficient Evidence**

20      Petitioner's second claim for relief is that the evidence introduced at his trial is

21  insufficient to support his conviction for kidnapping.  ECF No. 1-1 at 87-101.  The prosecutor

22  argued to the jurors that they could find the defendants guilty of kidnapping on either a

23  conspiracy theory or a theory of aiding and abetting.  The trial court instructed the jury on both of

24  these theories.  Clerk's Transcript on Appeal (CT) at 992-94, 998-99; RT at 1731.  Petitioner

25  argues there is no substantial evidence he participated in the kidnapping, either as an aider and

26  abettor or as a co-conspirator.  Specifically, he argues there is insufficient evidence he had the

27  specific intent to kidnap S.L. or to bring about her kidnapping.  ECF No. 1-1 at 91.  He also

28  /////

22

argues that his actions were identical to those of Edgar Radillo, who was acquitted of the

kidnapping charge.  *Id.* at 89.

### 1. State Court Decision

The California Court of Appeal denied petitioner's claim of insufficient evidence to

support the kidnapping charge, reasoning as follows:

> In argument to the jury, the prosecutor mentioned there were potentially three kidnappings: (1) "when they passed Covell," (2) "when they went to County Road 26A," and (3) "when Israel carried her to that bush."  The prosecutor further argued the jurors need not agree on which leg of the overall movement constituted the kidnapping.  However, the prosecutor also emphasized that the movement of the victim was a continuous course of conduct and amounted to but one offense.

> Alberto contends there is insufficient evidence to support his conviction for kidnapping under any theory.  He points to the fact that Edgar was not convicted of kidnapping and argues his conduct in this affair was identical to that of Edgar.  According to Alberto, he, like Edgar, remained silent while Israel transported S.L. to the crime scene and he did not assist Israel in moving S.L. to the grassy area.

> ****

> In order to prove simple kidnapping under section 207, subdivision (a), the prosecution must establish that "'(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.'"  (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.)

> Alberto does not dispute that a kidnapping occurred in this instance.  Instead, he argues there is no substantial evidence he participated in it, either as an aider and abettor or as a coconspirator.  In particular, Alberto argues there is no evidence he had the specific intent to kidnap the victim.  He asserts his mere presence in the car, like that of Edgar, is insufficient to establish his participation in the crime.

> Alberto is wrong on the evidence.  According to Antonio, in addition to being the one who initially spoke to S.L. and offered her a ride, Alberto was later seen whispering to Israel in the front seat.  After S.L. got into the car, nobody even asked her how to get to her home.  Alberto was also the one who said he knew a place out in the country where they used to go party.  Finally, as Israel drove out of Davis, S.L. asked where they were going and nobody, including Alberto, responded.

> Alberto argues his statement about knowing a place where they used to go party was made before they left Davis and, hence, before the kidnapping commenced.  However, the timing of Alberto's

statement does not render it irrelevant on the issue of intent. Alberto's statement about knowing a party place demonstrates his intent not to take S.L. home as she requested. If the statement was made before they left Davis, as Alberto claims, it simply infers Alberto formed an intent to kidnap the victim at least by that time, as further supported by his whispering something to Israel. And Alberto's silence after the victim asked why she was not being taken home infers he maintained that intent after they left Davis.

As for the additional movement of S.L. at the crime scene, Antonio testified that after they arrived, Israel and Alberto got out of the car and walked over to where Edgar was holding S.L. He further testified he saw Israel and Alberto say something to each other and then saw Alberto assist in taking off S.L.'s clothes. Finally, and most importantly, Antonio testified that both Israel and Alberto walked S.L. over to the grassy area where she was raped. Thus, the evidence amply supports Alberto's intent and participation in the kidnapping.

Israel contends the record does not support the prosecution's argument to the jury that a separate kidnapping occurred when the victim was moved from the car to the grassy area. He argues there is insufficient evidence this movement was for a substantial distance, as required for simple kidnapping. Israel points out that S.L. testified the rapes occurred "fairly close" to the car. He further asserts Antonio's testimony about how far S.L. was moved was all over the place. Although Antonio indicated S.L. was moved as much as 20 feet, he also testified S.L. was moved only a couple of feet, and ultimately said he did not know how far she was moved.

Israel further contends it cannot be determined from the record which portion of the overall movement the jury used to convict him of kidnapping. Therefore, because there is insufficient evidence that the final movement at the crime scene amounted to a kidnapping, the conviction must be reversed.

Where a case is presented "to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1122.) In *People v. Green* (1980) 27 Cal.3d 1 (*Green*), *overruled by People v. Martinez* (1999) 20 Cal.4th 225 (*Martinez*), the defendant was convicted of murder, robbery and kidnapping. The latter could have been based on any of three distinct segments of asportation. (*Id.* at pp. 62–63.) The trial court misinstructed the jury on the law as to the first segment and the high court concluded movement of the victim 90 feet in the third segment was insufficient as a matter of law for kidnapping. Only the second movement supported the conviction. (*Id.* at pp. 63–65, 67.) Because it could not be determined from the record which movement the jury relied on to convict the defendant, the kidnapping conviction could not stand. (*Id.* at pp. 71, 74.)

24

The present matter does not involve multiple discrete acts of kidnapping but one continuous course of conduct that began when defendants drove the victim past her exit and ended when defendants left her behind at the crime scene. It is unfortunate that the prosecutor chose to break down the asportation into segments for purposes of jury argument. Apparently the prosecutor was concerned that the jury might conclude S.L. had accompanied defendants to the crime scene voluntarily. However, whether S.L.'s consent was rescinded when they drove past her exit or when she was carried from the car to the grassy area after pleading to be left alone does not matter. What matters is that at some point during this continuum of movement, S.L. no longer went along voluntarily. At that point, the kidnapping commenced.

At any rate, Israel's sufficiency of the evidence argument is premised on an assertion that movement of S.L. at the crime scene, the purported third segment of the movement, was insufficient as a matter of law to satisfy the asportation requirement of simple kidnapping. As we shall explain, we disagree.

In *Martinez*, the California Supreme Court changed the standard previously established in *People v. Caudillo* (1978) 21 Cal.3d 562 and *People v. Stanworth* (1974) 11 Cal.3d 588 for assessing the asportation requirement for simple kidnapping. Under prior law, the only relevant factor was the actual distance moved. (*Caudillo*, at p. 574; *Stanworth*, at p. 603.) "*Martinez* overruled *Caudillo* to the extent it 'prohibited consideration of factors other than actual distance' (*Martinez, supra*, 20 Cal.4th at p. 237, fn. 6) because 'limiting a trier of fact's consideration to a particular distance is rigid and arbitrary, and ultimately unworkable' (*id.* at p. 236). *Martinez* established a new asportation standard for simple kidnapping – one that took into account 'the "scope and nature" of the movement . . ., and any increased risk of harm' – thereby bringing the standard closer to the one for aggravated kidnapping. (*Ibid.*) *Martinez* required a jury to 'consider the totality of the circumstances' in deciding whether a victim's movement is substantial. (*Id.* at p. 237.) 'Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.' (*Ibid.* . . . )" (*People v. Bell, supra*, 179 Cal.App.4th at p. 436, italics omitted.)

*Martinez* made clear that for simple kidnapping the asportation must be "'substantial in character,'" which may include consideration of more than just the distance moved. (*Martinez, supra*, 20 Cal.4th at p. 235.)

The jury here was instructed in accordance with the revised standard of *Martinez*. The prosecutor further argued the jury may consider such factors as whether the movement increased the risk of

harm or decreased the likelihood of detection in deciding whether movement of the victim was substantial.

The victim was moved at the crime scene no more than 20 feet. However, it is the character of that movement that satisfies the requirements for simple kidnapping. During the testimony of Antonio S., the prosecution played a DVD depicting the approach to the crime scene on a county road and entry up the gravel driveway where the sexual assault occurred. That DVD shows clearly that any car parked along the driveway would have been visible from the county road. However, because of trees, bushes and underbrush in the area, movement of the victim from the vicinity of the car to a grassy area 20 feet away would have made it impossible for anyone passing by on the road to see the assault taking place. In other words, the movement decreased the likelihood of detection.

In *People v. Dominguez* (2006) 39 Cal.4th 1141 (*Dominguez*), the defendant moved the victim from the side of a road down an embankment to a spot 25 feet away and 10 to 12 feet below the road surface. This was a location "where it was unlikely any passing driver would see her" and where trees would have tended to obscure the crime scene. (*Id.* at p. 1153.) According to the court: "The movement thus changed the victim's environment from a relatively open area alongside the road to a place significantly more secluded, substantially decreasing the possibility of detection, escape or rescue." (*Ibid.*) The high court concluded this movement was sufficient to support the defendant's kidnapping conviction. (*Id.* at p. 1155.)

Although *Dominguez* involved a prosecution for aggravated kidnapping, which requires a finding that the movement increased the risk of harm to the victim (*Dominguez, supra*, 39 Cal.4th at p. 1150), *Martinez* brought the standard for simple kidnapping closer to that of aggravated kidnapping (*People v. Bell, supra*, 179 Cal.App.4th at p. 436). Essentially, both types of kidnapping are assessed in terms of whether the movement increased the risk of harm to the victim, but only aggravated kidnapping requires such a finding.

In the present matter, we conclude movement of the victim from the car to the secluded area 20 feet away, thereby making it less likely the sexual assault would be detected and more likely further crimes could be committed on the victim, was sufficient to support the kidnapping convictions of Israel and Alberto.

*Sanchez*, 2011 WL 3806264, at ** 20-23.

Petitioner argues that, under California law, the mere fact that he was silent after S.L. stated she wanted to go home was insufficient to establish he harbored the specific intent to kidnap S.L. ECF No. 1-1 at 91-92. He contends that the acquittal of Edgar Radillo on the kidnapping charges demonstrates that the jury did not view his actions as evidence of specific

1   intent. *Id.* at 92.  He states that he, "like Edgar, did or said nothing after S.L. withdrew consent –

2   i.e., at the time she was being kidnapped." *Id.* at 99.

3       Petitioner also disagrees that his statements about "knowing a party place" constitute valid

4   evidence of an intent to rape S.L.  He notes that these comments were made while they were

5   driving around Davis, which was before S.L. withdrew her consent to being in the car. *Id.* at 93,

6   96.  Petitioner also argues that the trial testimony reflected he did not give Israel Sanchez

7   directions to the "party place," but rather was trying to give Israel directions to S.L.'s residence.

8   *Id.* at 94, 95-96.  He argues that there is no evidence he gave Israel Sanchez directions on how to

9   get to the location of the rape. *Id.* at 97-98.  Petitioner disagrees with the California Court of

10   Appeal that the evidence demonstrates he had the specific intent to take S.L. out to the country

11   and rape her, either prior to or after S.L. withdrew her consent. *Id.* at 99-100.

12       Petitioner also argues the evidence does not support the assertion by the California Court

13   of Appeal that he assisted Israel in moving S.L. away from the car to the grassy area where she

14   was raped. *Id.* at 100.  He notes, in this regard, that the prosecutor argued to the jury that Israel

15   "alone" moved S.L. from the car to the bushes. *Id.*  He argues that the jury must have accepted

16   this argument. *Id.*  Petitioner further argues that the distance the victim was moved was not far

17   enough, under California law, to support the asportation requirement of the kidnapping statute.

18   *Id.* at 101.  Petitioner summarizes his argument as follows:

19   
20   > Hence, the evidence produced at trial was insufficient to support the jury's verdict finding petitioner guilty of kidnapping and its true findings on the special allegations with respect to kidnapping, in violation of federal due process.  The court of appeal's reasoning that petitioner's mere mention of a party place when S.L. was consensually in the vehicle, partying and apparently enjoying herself and whispering unknown statements to Israel implied an intent to kidnap is unreasonable.  No rational trier of fact would conclude that such evidence supported a finding that petitioner intended to take S.L. to a location against her will beyond a reasonable doubt.

25   *Id.*

26   ### 2. <u>Applicable Legal Standards</u>

27       The Due Process Clause "protects the accused against conviction except upon proof

28   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

charged." *In re Winship*, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a

conviction if, "after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under

*Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a

reasonable doubt.'"  *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443

U.S. at 318).  Put another way, "a reviewing court may set aside the jury's verdict on the ground

of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos*

*v. Smith*, ___ U.S. ___, 132 S.Ct. 2, *4 (2011).  Sufficiency of the evidence claims in federal

habeas proceedings must be measured with reference to substantive elements of the criminal

offense as defined by state law.  *Jackson*, 443 U.S. at 324 n.16.

     In conducting federal habeas review of a claim of insufficient evidence, "all evidence

must be considered in the light most favorable to the prosecution."  *Ngo v. Giurbino*, 651 F.3d

1112, 1115 (9th Cir. 2011).  "*Jackson* leaves juries broad discretion in deciding what inferences

to draw from the evidence presented at trial," and it requires only that they draw "'reasonable

inferences from basic facts to ultimate facts.'"  *Coleman v. Johnson*,___ U.S. ___, 132 S.Ct.

2060, 2064 (2012) ( per curiam ) (citation omitted).  "'Circumstantial evidence and inferences

drawn from it may be sufficient to sustain a conviction.'"  *Walters v. Maass*, 45 F.3d 1355, 1358

(9th Cir. 1995) (citation omitted).

     "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

*Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  Because this case is governed by the

AEDPA, this court owes a "double dose of deference" to the decision of the state court.  *Long v.*

*Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (quoting *Boyer v. Belleque*, 659 F.3d 957, 960 (9th

Cir. 2011), *cert. denied* ___ U.S. ___, 132 S.Ct. 2723 (2012)).

### 3. Analysis

     The decision of the California Court of Appeal rejecting petitioner's arguments that the

evidence was insufficient to support his conviction for kidnapping is not contrary to or an

unreasonable application of federal law and should not be set aside.  The Court of Appeal determined that there was sufficient evidence of petitioner's intent to kidnap S.L. based on a number of factors, when considered together.  Specifically, the court cited evidence in the record that: (1) petitioner was the first person to speak to S.L. when he offered her a ride; (2) petitioner was whispering to Israel in the front seat of the car while they were driving around Davis; (3) although defendants asked S.L. where she lived, "nobody . . . asked her how to get to her home;" (4) petitioner mentioned he knew a "party place" out in the country; and (5) petitioner did not respond when S.L. asked where they were going as they left Davis.  A rational trier of fact could have agreed with the jury that these facts supported a finding that petitioner intended to take S.L. out of Davis without her consent.  Thus, the state appellate court's conclusion that these circumstances, when considered together, supported the jury finding that petitioner intended to take S.L. out to the country without her consent is not objectively unreasonable.

With respect to whether petitioner and his co-defendants asked S.L. for directions to her house after she told them her street address, Antonio testified that they did not.  Specifically, the prosecutor asked Antonio, "After the young lady had given the name of the street she lived on, did anybody ever ask her how to get there?"  RT at 282.  Antonio responded, "no." *Id.*  Antonio also testified that petitioner did not have "a continuing conversation with [S.L.] about how to get to her house" after she told them her address; that once S.L. "said what street she lived on, the only conversation was between [petitioner] and Israel;" and that after she stated the name of the street she lived on, nobody said anything. *Id.* at 279, 281.  It is true that Antonio also testified petitioner asked S.L. where she lived; that Israel tried to look for her house but couldn't find it; and that petitioner "was the one giving the directions where to turn." *See id.* at 278-79.  However, when viewed in its entirety, Antonio's testimony does not conclusively establish that petitioner was giving Israel directions to S.L.'s house.  In fact, his testimony was more susceptible to the interpretation that petitioner and Israel agreed in a whispered conversation to take S.L. out of Davis and into the country, and that petitioner gave Israel directions how to get there.

/////

29

1   Antonio testified that while they were driving around Davis, petitioner and Israel, who

2   was driving the car, were whispering to each other. *Id.* 280-81. He stated that as they were

3   driving out to the country, S.L. asked where they were going, but nobody responded. *Id.* at 285.

4   Antonio also testified that as they were driving around Davis, petitioner mentioned that he "knew

5   of a place that he used to go out to back in the day." *Id.* at 362. Antonio understood this to mean

6   a place where petitioner "used to go back and party." *Id.* After petitioner said this, they drove

7   out of Davis to the location where the rape occurred. *Id.* at 447.

8   All of this evidence could fairly be interpreted to support the state court's conclusion that,

9   during the time they were driving around Davis, petitioner and Israel formed the intent to drive

10   out to the country without S.L.'s consent. With regard to petitioner's participation, Antonio's

11   testimony that petitioner was giving Israel directions and whispering to him in the car supports a

12   jury finding that petitioner told Israel how to get to the area where the rapes occurred and, in that

13   manner, had some control over the movement of the car. The fact that there is another way to

14   interpret this evidence is not dispositive of petitioner's claim. As explained above, a reviewing

15   court must view the evidence in the light most favorable to the prosecution. *Jackson*, 443 U.S. at

16   319.

17   The California Court of Appeal also reasonably concluded, after a careful analysis of state

18   law and the facts of this case, that petitioner and Israel Sanchez moved the victim for a substantial

19   distance against her will after her participation was no longer voluntary. This conclusion is

20   supported by the testimony of Antonio Sanchez, who testified on direct examination that

21   petitioner and Alberto walked the victim a "couple of feet" away from the car to a grassy area

22   near a tree, where they laid her down on the ground. RT at 303, 307, 308, 392. On cross-

23   examination, Antonio testified that the distance was "about 15 feet." *Id.* at 456. When asked

24   whether he remembered how many feet it was, he responded, "no." *Id.* However, Antonio never

25   wavered in his testimony that the victim was moved some feet away from the car to a grassy area.

26   A rational jury could have concluded from his statements that the victim was moved away from

27   /////

28   /////

30

1   the car to a location that "decreased the likelihood of detection." *Sanchez*, 2011 WL 3806264, at

2   *22.  As stated by the California Court of Appeal, under California law this is sufficient to satisfy

3   the asportation requirement of the kidnapping statute.

4          The California Court of Appeal's rejection of petitioner's claim of insufficient evidence is

5   not clearly erroneous and does not constitute an unreasonable application of *Winship* to the facts

6   of this case.  Certainly, the Court of Appeal's decision is not "so lacking in justification that there

7   was an error well understood and comprehended in existing law beyond any possibility for

8   fairminded disagreement." *Richter*,131 S. Ct. at 786-87.  Accordingly, petitioner is not entitled to

9   federal habeas relief on this claim.

10         **C.  Jury Instruction Claims**

11         Petitioner raises several claims of jury instruction error.  After setting forth the applicable

12   legal principles, the court will address these claims below.

13              **1.  Applicable Legal Principles**

14         In general, a challenge to jury instructions does not state a federal constitutional claim.

15   *McGuire*, 502 U.S. at 72; *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695

16   F.2d 1195, 1197 (9th Cir. 1983).  "Failure to give [a jury] instruction which might be proper as a

17   matter of state law," by itself, does not merit federal habeas relief." *Menendez v. Terhune*, 422

18   F.3d 1012, 1029 (9th Cir. 2005) (quoting *Miller v. Stagner*, 757 F.2d 988, 993 (9th Cir. 1985)).

19   In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

20   'undesirable, erroneous, or even "universally condemned,"' but must violate some due process

21   right guaranteed by the fourteenth amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).

22   To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected

23   the entire trial that the resulting conviction violates due process.'" *Prantil v. State of Cal.*, 843

24   F.2d 314, 317 (9th Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)).  In

25   making its determination, this court must evaluate the challenged jury instructions "'in the

26   context of the overall charge to the jury as a component of the entire trial process.'" *Id.* (quoting

27   *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).  If a jury instruction is ambiguous,

28   inconsistent or deficient, it will violate due process only when there is a reasonable likelihood that

31

the jury applied the instruction in a manner that violates the constitution. *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009).

### 2. Failure to Give a Unanimity Instruction

Petitioner claims that the trial court violated his federal right to due process in failing to instruct the jurors that they must agree unanimously as to which act or acts constituted the kidnapping. ECF No. 1-1 at 102-104. He argues that because the prosecutor told the jury there were several movements of the victim that could form the basis for the kidnapping charge, and because petitioner offered separate defenses to each movement, under California law he was entitled to a unanimity instruction. ECF No. 21 at 14. He argues that the Fourteenth Amendment due process clause protects against the "arbitrary deprivation" of a liberty interest to which a defendant is entitled under California law. ECF No. 1-1 at 103.

The California Court of Appeal denied this jury instruction claim, reasoning as follows:

> Israel contends the trial court erred in failing to instruct the jury that it must unanimously agree which phase of asportation constituted the kidnapping. As noted earlier, the prosecutor stated in argument to the jury that there were potentially three kidnappings, including the drive from Davis to the country and the movement of the victim from the car to the grassy area.
>
> "In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a specific crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.] . . . [¶] On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)
>
> This case was not tried on a theory that the kidnapping involved multiple phases. As discussed earlier, the evidence presented to the jury showed a continuous course of conduct from the time defendants left Davis to the time they abandoned S.L. in the bushes after sexually assaulting her. As the Court of Appeal explained in *People v. Cortez* (1992) 6 Cal.App.4th 1202, "[k]idnapping is a substantial movement of a person accomplished by force or fear.

[Citations.]   'As long as the detention continues, the crime continues.' [Citations.] . . . [¶]  '[A] unanimity instruction is not required when the case falls within the continuous course of conduct exception.' [Citation.] This exception is applicable where, by its very nature, the charged offense consists of a continuous course of conduct.  [Citation.]  Kidnapping inherently involves a continuous course of conduct." ( Id. at p. 1209.)

In the present matter, the prosecutor argued movement of the victim from the car to the bushes alone constituted a kidnapping. However, this does not mean there were two discrete segments of the kidnapping.  The jury could have concluded there was one continuous kidnapping from the time defendants left Davis with the victim until they abandoned her in the bushes.  In the alternative, the jury could have concluded the victim accompanied defendants to the country voluntarily, as defendants argued, but was then kidnapped when she was taken from the car to the bushes.  Either way, in order to convict Israel of kidnapping, all 12 jurors had to conclude that at least the last part of the continuous movement, from the car to the bushes, constituted a kidnapping.  Thus, no unanimity instruction was required.

*Sanchez*, 2011 WL 3806264 at **29-30.

Federal due process demands a certain "verdict specificity" and "fundamental fairness." *Schad v. Arizona*, 501 U.S. 514, 637 (1991).  There is no evidence that this standard was not satisfied here.  As explained by the California Court of Appeal, "the present matter does not involve multiple discrete acts of kidnapping but one continuous course of conduct that began when defendants drove the victim past her exit and ended when defendants left her behind at the crime scene." *Sanchez*, 2011 WL 3806264, at 21.  Thus, absent any indication of confusion or a lack of unanimity, petitioner has failed to show that his trial was rendered fundamentally unfair by the trial court's refusal to instruct the jurors that they had to agree unanimously on which particular movement of the victim constituted the kidnapping.  Where, as here, the challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997).  Petitioner has failed to meet this heavy burden.[3]

---

[3] Further, the conclusion of the California Court of Appeal that petitioner was not entitled to a unanimity instruction because the kidnapping constituted a continuous course of conduct is not arbitrary or unfair, or an objectively unreasonable application of California law. *Cf. Hicks v.*

33

1        Nor is petitioner entitled to relief on his claim that the trial court's failure to give a

2  unanimity instruction violated his right to a unanimous verdict.  As a state criminal defendant in a

3  noncapital case, petitioner had no federal constitutional right to a unanimous jury verdict.

4  *Apodaca v. Oregon*, 406 U.S. 404, 410-12 (1972); *Schad*, 501 U.S. at 635 n.5; *see also Johnson*

5  *v. Louisiana*, 406 U.S. 356, 359 (1972) (the Supreme Court "has never held jury unanimity to be

6  a requisite of due process of law.").

7        For all of the foregoing reasons, petitioner is not entitled to relief on this jury instruction

8  claim.

9              **3.  Improper Instruction on Aiding and Abetting Kidnapping Charges**

10        In his next ground for relief, petitioner claims that the trial court violated his right to due

11  process in failing to instruct the jury that aiding and abetting kidnapping and conspiracy to

12  commit kidnapping are specific intent crimes which require "a concurrence of act and specific

13  intent."  ECF No. 1-1 at 105.

14        The California Court of Appeal explained the background to this claim and petitioner's

15  arguments, as follows:

16             **Instructions on Aiding and Abetting Kidnapping**

17          The jury was instructed pursuant to CALCRIM No. 252 that all the
           charged offenses except false imprisonment and sexual battery
18          require a union or joint operation of act and wrongful intent.  The
           instruction identified false imprisonment and sexual battery as
19          specific intent crimes.   It also identified the following lesser
           included offenses as specific intent crimes: attempted kidnapping,
20          attempted rape, assault with intent to commit rape, attempted false
           imprisonment, sexual battery without restraint, and false
21          imprisonment without force or violence.

22          Alberto contends the trial court was required to include in the list of
           specific intent crimes the crimes of aiding and abetting kidnapping
23          and conspiracy to kidnap.  He argues the jury was therefore never
           called upon to determine if he "had the specific intent to kidnap
24          S.L. at the same time that he agreed to kidnap S.L., or encouraged
           or brought about the kidnapping of S.L."  Alberto points out that
25          the only statement he made that could arguably show his complicity

26

27  *Oklahoma*, 447 U.S. 343, 346 (1980) (Fourteenth Amendment violated by arbitrary deprivation of
    interest to which a defendant is entitled under state law).  The conclusion that the kidnapping
    constituted a continuous course of conduct, rather than several discrete kidnappings, is consistent
28    with the facts of this case.

in the kidnapping was his statement about knowing a place where they could go to party.  However, Alberto argues, this statement was made before they left Davis and, therefore, before the kidnapping commenced.  According to Alberto, "[h]ad the jury been properly instructed that it must find that [he] had the specific intent to kidnap at the same time he did some act to control the vehicle, it is reasonably probable that it would have acquitted [him] of [kidnapping] and found the special allegations to be not true, saving him a life sentence."

*Sanchez*, 2011 WL 3806264, at *23.

The Court of Appeal rejected petitioner's arguments in this regard, reasoning as follows:

Alberto's argument that the only act he did in aid of the kidnapping or in furtherance of the conspiracy to kidnap came before the kidnapping commenced betrays a fundamental misunderstanding of the requirement that the defendant have a union or joint operation of act and wrongful intent.  The act at issue is not Alberto's statement about a party place or anything else he might have done to facilitate the kidnapping.  The act is the kidnapping itself.  The question is whether at the time of the kidnapping, Alberto had the requisite intent to aid and abet or conspire in the kidnapping.  As explained earlier, the jury could reasonably infer that if Alberto had the requisite intent at the time he made the statement about knowing a party place, he continued to have that intent after the kidnapping commenced.

As to the trial court's purported failure to instruct on the need for a union of act and intent, that is not true.  In the very instruction Alberto cites, the court instructed the jury that a union or joint operation of act and intent is required for various counts of the information, including the kidnapping count.  Later, the court instructed the jury pursuant to CALCRIM No. 401 that, to find a defendant guilty on an aiding and abetting theory, it must find among other things that "[b]efore or during commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime."  This instruction further read: "Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

The jury was similarly instructed on conspiracy that it requires, among other things, proof that the defendant "intended to agree and did agree with one or more of the other defendants to commit kidnap and/or rape" and "[a]t the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit kidnap and/or rape."

*Id.* at *24.

/////

35

1   Petitioner argues, as he did in state court, that his statement about going to a "party place"

2   does not constitute evidence of an intent to kidnap because it was made before S.L. withdrew her

3   consent to remain in the car.  ECF No. 1-1 at 107.  He also argues that, even if it was possible to

4   form intent before the kidnapping began, his statements about a "party place," viewed in the

5   context of all of his actions as a whole, are insufficient to establish that he harbored a specific

6   intent to kidnap S.L. at the same time he actually committed the act of kidnapping.  *Id.*

7   For the reasons described in the discussion on the preceding claim, the California Court of

8   Appeal's decision that the trial testimony supports the jury's finding that petitioner formed the

9   intent to kidnap S.L. while he was driving around Davis with his co-defendants and continued to

10   have that intent after the kidnapping commenced is not an unreasonable determination of the facts

11   of this case.  Accordingly, petitioner's argument that that the only act he did in aid of the

12   kidnapping or in furtherance of the conspiracy to kidnap came before the kidnapping commenced

13   and ended there does not demonstrate entitlement to habeas corpus relief.

14   The California Court of Appeal also concluded that the jury instructions, as a whole,

15   sufficiently instructed the jurors that they must find petitioner harbored the intent to kidnap at the

16   same time he assisted in or agreed to the kidnapping.  The court found it was not necessary to

17   include aiding and abetting kidnapping and conspiracy to commit kidnaping in CALCRIM No.

18   252 because kidnapping itself was included in that instruction.  Petitioner disagrees with these

19   conclusions by the state court.  He argues that the jury should have been specifically instructed in

20   CALCRIM 252 that it was necessary to find that he had the specific intent to kidnap at the same

21   time he aided and abetted or agreed to kidnap S.L.  Petitioner also argues that the conspiracy

22   instruction did not correctly convey the principle that petitioner himself, as opposed to simply one

23   of his conspirators, must have harbored the requisite intent at the same time he committed the act

24   of kidnapping.  ECF No. 21 at 15-16.  He argues that, for this reason, the jury may have found

25   him guilty of the kidnapping on the incorrect theory that he was guilty of kidnapping because he

26   conspired to commit rape.  *Id.*

27   After a review of the record, this court concludes that the reasoning and ultimate decision

28   of the California Court of Appeal on this claim is not contrary to or an unreasonable application

of the federal authorities set forth above.  The Court of Appeal's decision is also consistent with

the record facts.  *See* CT at 971 (instructing the jury that a union or joint operation of act and

intent was required for various counts of the information, including the kidnapping count); CT at

993 (instructing the jury that to find a defendant guilty on an aiding and abetting theory, it must

find among other things that the defendant intended to aid and abet the perpetrator of the crime

and did, in fact, aid and abet that crime); CT at 998 (instructing the jury that conspiracy requires

proof that the defendant intended to agree and did agree with one or more of the other

conspirators to commit kidnap and/or rape and, at the time of the agreement, "the defendant **and**

one or more of the other alleged members of the conspiracy" intended that one or more of them

would commit kidnap and/or rape) (emphasis added).  Under the circumstances presented here,

and for the reasons explained by the Court of Appeal, it is reasonable to conclude that the jury

instructions, as a whole, correctly advised the jury of the necessity to find a concurrence between

petitioner's intent and his actions with respect to the kidnapping charge.  Accordingly, petitioner

is not entitled to relief on this claim.

### 4. <u>Misinstruction on Vicarious Liability for the Acts of Co-Conspirators</u>

Petitioner claims in his next ground for relief that the trial court violated his right to due

process because CALCRIM No. 416, the jury instruction on "evidence of uncharged conspiracy,"

allowed the jury to find him vicariously liable for the kidnapping of S.L. without also finding that

he intended that he or a co-conspirator kidnap S.L., or that the kidnapping was a natural and

probable consequence of the rape.  ECF No. 1-1 at 111.  He argues that CALCRIM No. 416

allowed the jury to find that he was responsible for Israel Sanchez's kidnapping of S.L. based

only on a finding that petitioner agreed to the rape of S.L. and intended that S.L. be raped.  *Id.* at

112.  Petitioner argues that because the evidence is insufficient to support a finding that he

intended that S.L. be kidnapped, "it is likely that the jury premised petitioner's guilt on count one

and the special allegations on Israel's kidnapping."  *Id.* at 113.  \

/////

/////

/////

The California Court of Appeal denied this jury instruction claim, reasoning as follows:

**Conspiracy Instructions**

Alberto challenges his kidnapping conviction on the basis of erroneous conspiracy instructions. He argues the instruction given, CALCRIM No. 416, "allowed the jury to find [him] vicariously liable for kidnaping [sic] of S.L. without also finding that he had the intent that he or a co-conspirator kidnap S.L., or that the kidnaping [sic] was a natural and probable consequence of the rape." Alberto further argues that because the evidence is insufficient to support a finding he intended that they kidnap the victim, "it is likely the jury premised [his] guilt on count one and the special allegations on Israel's kidnaping [sic] of S.L."

Once again, Alberto relies on a mistaken interpretation of the evidence. The fact that Alberto's only verbal expression of intent to kidnap the victim, i.e., mentioning that he knew about a place where they could go party, may have come before the kidnapping commenced does not mean there was insufficient evidence his intent to kidnap the victim existed at the same time as the kidnapping.

As for the conspiracy instruction itself, CALCRIM No. 416, as given by the court, read:

"[The] People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy if done to help accomplish the goal of the conspiracy.

"To prove that a defendant was a member of a conspiracy in this case, the People must prove that: One, the defendant intended to agree, and did agree, with one or more other defendants to commit kidnapping and/or rape; two, at the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit kidnap and/or rape; three, the defendant's [sic] committed at least one of the following overt acts to accomplish the kidnap and rape:

"One, gave directions to get to a known, isolated area; two, drove past Covell exit; three, drove into driveway off 26A; four, removed SL's clothes; five, carried SL to the grass; six, distributing condoms; and, four [sic], at least one of those – excuse me, at least one of these overt acts was committed in California.

"To decide whether a defendant committed these overt acts, consider all of the evidence presented about the acts. To decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit the kidnapping and/or rape,

please refer to the separate instructions I will give you on those crimes.

38

"The People must prove that the members of the alleged conspiracy had an agreement and intent to commit kidnapping – kidnap and/or rape. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit one or more of those crimes.  [¶] . . . [¶]

"You must decide as to each defendant whether he or she was a member of the alleged conspiracy.

"The People contend that the defendants conspired to commit one or more of the following crimes: Kidnap and/or rape.

"You may not find the defendant guilty under conspiracy theory unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, and you all agree which crime he conspired to commit.

"A member of a conspiracy doesn't have to personally know the identity or roles of all the other members.  Someone who merely accompanies or associates with members of the conspiracy but who does not intend to commit the crime is not a member of the conspiracy.

"Evidence that a person did an act or made a statement that was - evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough by itself to prove the person was a member of the conspiracy."

Alberto contends the foregoing instruction allowed the jury to find him guilty of kidnapping based solely on a determination that he conspired to commit rape.  Alberto argues the instruction should have explained that he could be convicted of kidnapping based on a finding that he conspired to commit rape only if kidnapping was a natural and probable consequence of the rape.  Alberto points out that, while the jury was instructed on natural and probable consequences, that instruction was expressly limited to whether Alberto could be held liable for sexual battery based on a finding that he committed kidnapping or rape.

The People contend any deficiency in the conspiracy instruction was cured by CALCRIM No. 3501, which the court also gave the jury.  It read: "It is the prosecution's theory that the defendants conspired to kidnap and/or rape SL, and as a result, they are all responsible for all crimes committed in the course or furtherance of the conspiracy to commit those target crimes that are the natural and probable consequences of the conspiracy to commit those crimes.  [¶]  The People have presented evidence of more than one target crime of the conspiracy to prove that the defendants committed those offenses.   [¶]   You must not find the defendant guilty of the foreseeable crimes based on this theory unless, one, you all agree that the People have proved the defendants conspired to commit at least one of the target offenses, and you all agree which target offense they conspired to commit or; two, you all agree that the People have proved that the defendants conspired to commit both target offenses."

39

The foregoing instruction must be viewed in the context of the others given by the court. (*See People v. Espinoza* (1992) 3 Cal .4th 806, 823–824["[A] single instruction is not to be viewed in 'artificial isolation'; instead, it must be evaluated 'in the context of the overall charge'"].)   Earlier in the instructions, the court gave three separate instructions on the meaning of natural and probable consequences, one for each of the defendants.   The instruction for Alberto read: "The defendant, Alberto Sanchez, is charged in Count 1 with Kidnapping and Counts 2 and 4 with Rape by Force (Target offenses).   Alberto Sanchez is charged in Count 8 with Sexual Battery (Non target offense.)   [sic]   [¶]   You must first decide whether Alberto Sanchez is guilty of Kidnapping or Rape.  If you find Alberto Sanchez is guilty of either of these crimes, you must then decide whether he is guilty of Sexual Battery (Count 8).   [¶] Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time.   [¶]   To prove that Alberto Sanchez is guilty of: Sexual Battery (Count 8), the People must prove that: [¶] 1. Alberto Sanchez is guilty of Kidnapping or Rape. [¶] 2. During the commission of kidnapping or rape, a co-participant in that kidnapping or rape committed the crime of Sexual Battery [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of Sexual Battery was a natural and probable consequence of the commission of kidnapping or rape."

Read in the context of the foregoing instruction, CALCRIM No. 3501 merely reiterated that Alberto could be convicted of a sexual battery committed by one of his codefendants based on a conspiracy theory only if such sexual battery was a natural and probable consequence of the kidnapping or rape.  Beyond that, the instruction explained that the jury must agree as to which offense, rape or kidnapping, was the target of the conspiracy.

Nevertheless, we fail to see how Alberto was harmed by the instructions as given.  Alberto argues the instructions permitted the jury to find him guilty of kidnapping based on a finding that he conspired to commit rape without a further finding that kidnapping was a natural and probable consequence of the rape.  But there is nothing in these instructions that permitted such a finding.  The jury was informed there were two potential target offenses of the conspiracy, rape and kidnapping.  The jury was further informed Alberto could be convicted of sexual battery as a natural and probable consequence of the conspiracy to commit rape or kidnapping.  However, there is nothing that says the jury could likewise find Alberto guilty of kidnapping based on a finding that he conspired to commit rape.  In other words, the jury was instructed to determine if there was a conspiracy and to identify the target offense or offenses.  If the jury found the target offense to be rape, it could then determine Alberto is also guilty of sexual battery as a natural and probable consequence.  However, it was never told that if it found only one target offense, it could also convict Alberto of the other alleged target offense as a natural and probable

1
2

> consequence.  Under the instructions as given, if the jury concluded the only target of the conspiracy was rape, then it could not convict Alberto of kidnapping on a conspiracy theory.

3
4
5

> Thus, while it may have been better for the instructions to explain that the jury could find the defendants guilty of kidnapping as a natural and probable consequence of a conspiracy to commit rape, and vice versa, the failure of the instructions to do so was not prejudicial to Alberto.

6  *Sanchez*, 2011 WL 3806264, at **23-27.

7       Petitioner disagrees with the Court of Appeal's statement that under the jury instructions

8  as given, "if the jury concluded the only target of the conspiracy was rape, then it could *not*

9  convict [petitioner] of kidnapping on a conspiracy theory."  ECF No. 1-1 at 113.  He notes that

10  CALCRIM No. 3501 instructed the jury that petitioner was liable for all crimes of his co-

11  conspirators that were the natural and probable consequences of the conspiracy to commit the

12  target crimes of kidnap and/or rape.  *Id.*; *see also* CT at 1028.  He argues that CALCRIM No.

13  3501 allowed the jury to find him guilty of kidnapping "on the ground that Israel Sanchez

14  committed the kidnapping and the kidnapping could be conceived as a natural and probable

15  consequence of the rape, *even if the evidence failed to show that petitioner had the intent to rape*

16  *or to agree to rape at the time the kidnapping was occurring*."  *Id.* at 113-14 (emphasis in

17  original).  Petitioner argues that the erroneous conspiracy instruction violated his right to due

18  process and reduced the prosecution's burden of proof with regard to the kidnapping charge, in

19  violation of his rights under the Sixth Amendment.  ECF No. 1-1 at 114.

20       As noted, the California Court of Appeal concluded that any error in the jury instructions

21  challenged by petitioner was harmless because there was nothing in the jury instructions as a

22  whole that permitted the jury to find him guilty of kidnapping based solely on a finding that he

23  conspired to commit rape.  While the jury was informed petitioner could be convicted of *sexual*

24  *battery* committed by one of his co-defendants based on a conspiracy theory if the sexual battery

25  was a natural and probable consequence of the conspiracy to commit rape or kidnapping, the jury

26  was not informed that petitioner could be convicted of *kidnapping* on this basis.  As stated by the

27  California Court of Appeal, the jury "was never told that if it found only one target offense, it

28  could also convict [petitioner] of the other alleged target offense as a natural and probable

41

1   consequence." *Sanchez*, 2011 WL 3806264, at \*27.  Thus, as noted by the California Court of

2   Appeal, the instructions given to the jury did not provide for a guilty plea for kidnapping based

3   solely on a finding that petitioner conspired to commit rape.  This court must presume that jurors

4   follow a trial court's instructions, and there is no evidence that petitioner's jurors failed to do so

5   here.  *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985); *Tak Sun Tan v. Runnels*, 413 F.3d 1101,

6   1115 (9th Cir. 2005) ("we presume jurors follow the court's instructions absent extraordinary

7   situations").

8        The decision and the reasoning of the California Court of Appeal with respect to this

9   claim of jury instruction error is not unreasonable or "so lacking in justification that there was an

10   error well understood and comprehended in existing law beyond any possibility for fairminded

11   disagreement."  *Richter*,131 S. Ct. at 786-87.  Nor is the decision based on an unreasonable

12   determination of the facts of this case.  Accordingly, petitioner is not entitled to habeas relief on

13   this jury instruction claim.

14        **5.  Failure to Give Requested Pinpoint Instruction**

15        In his last jury instruction claim, petitioner argues that the trial court violated his right to

16   due process in failing to instruct the jury that "asportation by fraud alone does not constitute

17   kidnapping."  ECF No. 1-1 at 132.

18        The California Court of Appeal denied this claim, reasoning as follows:

19        **Pinpoint Instruction on Asportation by Fraud**

20        Defendants contend the trial court erred in failing to give a
     requested pinpoint instruction that consent to asportation obtained
21   by fraud precludes a kidnapping conviction.   The proposed
     instruction read in relevant part: "Furthermore, movment [sic] or
22   transportation which is accomplished by fraud, deceit or other false
     appearance is not kidnapping.   In other words, even if S.L.'s
23   consent was obtained by fraud, deceit or false appearance, the
     existence of such consent precludes a finding of kidnapping.  If
24   after consideration of all the evidence, you have a reasonable doubt
     whether the movement or transportation was accomplished by
25   fraud, deceit or other false appearance, you must give the defendant
     the benefit of that doubt and find him not guilty."
26
         "A trial court must instruct on the law applicable to the facts of the
27   case.  [Citations.]   In addition, a defendant has a right to an
     instruction that pinpoints the theory of the defense."  (*People v.*
28   *Mincey* (1992) 2 Cal.4th 408, 437.)  But, "[w]hat is pinpointed is

not specific evidence as such, but the theory of the defendant's case." (*People v. Adrian* (1982) 135 Cal.App.3d 335, 338.) "The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.)

In this instance, the trial court instructed the jury on consent as follows:   "The defendants are not guilty of kidnapping if they reasonably and actually believed that the other person consented to the movement.  [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant-defendants did not reasonably and actually believe that the other person consented to the movement.  If the People have not met this burden, you must find the defendants not guilty of this crime.  [¶]  The defendant is not guilty of kidnapping if the other person consented to go with the defendant.  [¶]  The other person consented if she, one, freely and voluntarily and agreed [sic] to go with or be moved by the defendants; two, was aware of the movement; three, had sufficient maturity and understanding to choose to go with the defendant.  [¶] The People have the burden of proving beyond a reasonable doubt that the other person did not consent to go with the defendant.  If the People have not met this burden, you must find the defendant not guilty of this crime.  [¶]  Consent may be withdrawn.  If at first a person agreed to go with the defendant, that consent ended if the person changed his or her mind and no longer freely and voluntarily agreed to go with or be moved by the defendant.  [¶]   The defendants are guilty of kidnapping . . . if after the other person withdrew consent the defendants committed the crime as I have defined it."

The People contend the foregoing instruction adequately covered the principle that defendants' pinpoint instruction sought to convey. We disagree.  The instruction given by the court indicated consent requires that the victim "freely and voluntarily" agreed to go with the defendant.  A reasonable jury could conclude from this that one who is tricked into going with another has not done so freely and voluntarily.

The People next argue the proposed instruction language was inaccurate in that it asserted movement or transportation "which is accomplished by fraud, deceit or other false appearance is not kidnapping."  The People point out that a given movement may be accomplished both by fraud and by force or fear and that such movement would support a kidnapping conviction.  We find it unlikely a reasonable jury would read the instruction language to include an asportation that is accomplished by means other than fraud, deceit or other false appearance alone.

However, we do find merit in the People's third argument.  They contend the proposed pinpoint instruction was not supported by the evidence.  We would add that the proposed instruction was also not consistent with defendants' theory of the case.

43

As the People point out, the defense did not pursue a theory that S.L. got into the car due to fraudulent misrepresentations that she was being taken home. On the contrary, defendants presented evidence that they did attempt to take S.L. home but were unable to find her residence. They further presented evidence that S.L. asked for marijuana, smoked it, and apparently changed her mind about going home and was content to cruise around with them. The prosecution theory was that S.L. consented to ride with defendants to her home and, when she realized they were not taking her home, her consent was rescinded.

Defendants rely on *Green, supra*, 27 Cal.3d 1, where, as discussed earlier, there were three distinct phases of asportation. In the first phase, the victim was tricked into accompanying one of the defendant's accomplices to a place where the defendant was waiting for her. (*Id.* at p. 62.) The Supreme Court concluded this portion of the asportation did not support a kidnapping conviction because "asportation by fraud alone does not constitute a general kidnaping [sic] offense in California." (*Id.* at p. 64.)

*Green* is readily distinguishable from the present matter. In that case, the victim believed she was being taken somewhere else during the entire trip to the place where the defendant was waiting for her. At no point during this phase of the asportation did the victim rescind her consent. In the present matter, once Israel drove the car past S.L.'s exit and out of Davis, S.L. was no longer under the false belief that she was being taken home. From that point on, the asportation was not pursuant to fraud, deceit or false appearance. It is this latter part of the trip that the prosecution relied upon for the kidnapping charge.

In light of the evidence presented and the parties' respective theories of the case, the trial court did not err in denying defendants' pinpoint instruction.

*Sanchez*, 2011 WL 3806264, at *27-29.

Petitioner disagrees with the state court's conclusion that his requested pinpoint instruction was not supported by the evidence and was not consistent with the defendants' theory of the case. He argues that Antonio's testimony regarding the circumstances of S.L.'s movement from Davis to the location where the rapes occurred provided evidentiary support for the position that S.L. remained in the car because she was willing to ride around and smoke marijuana. Thus, he contends that the jury could have found that the defendants presented a false appearance that they were going to the scene to party and that this would present a defense to kidnapping and the special allegations to kidnapping if premised on the first asportation to the scene. As petitioner explains the defense:

44

1
2
3
4
5
6

> While the prosecution argued that there was a separate asportation at the scene, there was evidence that S.L. voluntarily exited the vehicle because she was sick and never moved more than "a couple of feet" from the car.  S.L. herself testified that she was "[f]airly close" to the car when she was pushed to the ground.  RT 659-661.  Thus, there was evidence to support this defense, and the jury could have found that this second asportation was insufficient to support a conviction of kidnapping.  The failure to instruct on this theory of defense therefore had a substantial and injurious impact on the jury's verdicts and findings pertaining to count one, kidnapping, and the special allegations.

7
8

ECF No. 1-1 at 135.

9
10
11
12
13
14
15
16
17
18
19
20
21

The United States Supreme Court has held that "[a]s a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (citation omitted).  This standard is applicable to habeas petitions arising from state convictions.  *See Bradley v. Duncan*, 315 F.3d 1091, 1098-99 (9th Cir. 2002); *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir.1999) ("It is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case.").  The decision whether to give special jury instructions lies within the discretion of the judge, so long as the instructions given encompass the defense theory.  *See United States v. Hurd*, 642 F.2d 1179, 1181-82 (9th Cir.1981).  Failure to give a jury instruction on the defendant's theory of the case is reversible error if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant.  *United States v. Rodriguez*, 45 F.3d 302, 306 (9th Cir. 1995); *United States v. Yarbrough*, 852 F.2d 1522, 1541 (9th Cir. 1988).[4]

22
23

The conclusion of the California Court of Appeal that the pinpoint jury instruction requested by petitioner and his co-defendants was not supported by the evidence or consistent

24
25
26
27
28

_____

[4] In California, the trial court has a *sua sponte* obligation to give instructions on a defense when (1) defendant is relying on the defense or (2) there is substantial evidence supportive of the defense and when the defense is not inconsistent with the defendant's theory of the case.  *People v. Barton*, 12 Cal.4th 186 (1995).  To warrant a defense instruction, "the accused must present 'evidence sufficient to deserve consideration by the jury, i.e., evidence from which a jury composed of reasonable men could have concluded that the particular facts underlying the instruction did exist.'"  *People v. Strozier*, 20 Cal.App.4th 55, 63 (1993).

with the defense theory is not unreasonable and should not be set aside. Petitioner asserts that the jury could have found that defendants tried to "present a false appearance that they were going to the scene to party." ECF No. 1-1 at 135. However, there was no evidence the victim understood that this was the defendants' intention or that she wished or consented to go out to the country and party with the defendants. Rather, the evidence showed that the victim stated several times she wanted to go home and that as soon as the car passed her exit she asked where they were going but received no response. Petitioner argues that the victim may have voluntarily exited the car once they got out to the country because she felt sick. *Id.* However, there is no evidence she consented to be moved away from the car to the grassy area or to be pushed to the ground near the car, or that her movement at that time was induced by fraud. Petitioner has pointed to nothing in the record indicating that the defense theory of the case was that petitioner and his co-defendants induced S.L.'s consent to drive out to the country based on fraudulent representations that they were going out there to party.

Although petitioner's version of the trial evidence may be plausible, the reasoning of the California Court of Appeal that the jury instruction was not supported by the facts introduced at trial, and was not consistent with the defense theory, is also plausible. Thus, "'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 786. Under these circumstances, petitioner is not entitled to habeas relief. *Id.*

### D. <u>Violation of Right to Confrontation/Trial Severance</u>

In his next ground for relief, petitioner claims that the trial court's denial of his motion for a trial severance and the admission at a joint trial of the redacted police statements of co-defendants Israel Sanchez and Edgar Radillo violated his right to a fair trial and to confront the witnesses against him. ECF No. 1-1 at 114. He further argues the trial court's error in admitting these statements was not cured by a limiting instruction given by the trial court. *Id.* at 114-17.

#### 1. <u>State Court Decision</u>

Following the defendants' arrests, each was interviewed by the police and the interviews were recorded. The prosecution sought to introduce those recordings at defendants' joint trial.
/////

The California Court of Appeal observed that under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant has a right "to be confronted with the witnesses against him." *Sanchez*, 2011 WL 3806264, at *12 (citing U.S. CONST., amend. VI, and *Pointer v. Texas,* 380 U.S. 400 (1965)).  The court noted that the "central concern" of this right is "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Id.* (citing *Maryland v. Craig* 497 U.S. 836, 845 (1990)).  It also noted that the confrontation clause applies to hearsay statements that are "'testimonial' in nature, including statements made during police interrogation.'" *Id.* (quoting *Crawford v. Washington*, 541 U.S. 36 (2004) (*Crawford*)).  It also acknowledged that such hearsay may be admitted at trial only if the declarant is unavailable and the defendant has had a previous opportunity to cross-examine the declarant.  *Id.*  The petitioner argued that the trial court should have severed the trials because of the cross-incrimination of the defendants' out-of-court statements and that the failure to do so violated petitioner's right of confrontation under the Sixth Amendment.  The California Court of Appeal rejected that argument, reasoning as follows:

> In *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*), the California Supreme Court held that when the prosecution seeks to introduce an extrajudicial statement of one defendant that implicates other defendants, the trial court has three options: (1) in a joint trial, delete any direct or indirect identification of codefendants from the statement; (2) grant a severance; or (3) if severance is denied and effective deletion is impossible, exclude the statement altogether. (*Id.* at pp. 530–531.)  In *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), the United States Supreme Court held that introduction of an incriminating extrajudicial statement by a codefendant violates the defendant's confrontation right, even where the jury is instructed to disregard the statement in determining the defendant's guilt or innocence.

> Edgar moved in limine to exclude the pretrial statements of his codefendants.  He argued any statements by the other defendants implicating him would have to be redacted in a joint trial and, therefore, the court had three options: (1) separate trials, (2) redaction, or (3) separate juries.  Edgar further argued "there is no reasonable means by which the People can redact the statements" of the other defendants.  By inference, Edgar argued that if the court was inclined to admit the pretrial statements, it was required either to sever or to use separate juries.  Israel and Alberto joined in Edgar's motion.

> The trial court refused to sever the defendants' trials and, apparently, did not consider using separate juries.  Thus, the court

47

relied on redaction to protect defendants' constitutional rights. The court instructed the jury that the pretrial statements of a given defendant could only be considered as evidence against that defendant.

Defendants present a multi-pronged attack on the trial court's decision to try them jointly and to permit introduction of redacted versions of their out-of-court statements. They contend the court had essentially two choices, separate trials or exclusion of the statements altogether. They argue the redacted versions of the custodial interviews did not adequately eliminate references to codefendants, as required by *Aranda/Bruton*. Israel further argues the court erred in excluding from his custodial interview various exculpatory statements, which he was entitled to have admitted in evidence. As we shall explain, we find no abuse of discretion in denying defendants' motion to sever or in admitting redacted versions of defendants' out-of-court statements.

"When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order [sic] separate trials." (§ 1098.) Under this provision, the Legislature has stated a preference for joint trial of codefendants charged with the same offense. At the same time, the trial court retains discretion to grant separate trials. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1286.)

"The court should separate the trial of codefendants 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" (*People v. Turner* (1984) 37 Cal.3d 302, 312, *overruled on other grounds* in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149–1150.) "Whether denial of a motion to sever the trial of a defendant from that of a codefendant constitutes an abuse of discretion must be decided on the facts as they appear at the time of the hearing on the motion rather than on what subsequently develops." (*People v. Isenor* (1971) 17 Cal.App.3d 324, 334.)

Defendants contend the trial court erred in failing to sever their trials. However, the only ground asserted for separate trials was the cross-incrimination of defendants' out-of-court statements. This is also the basis for defendants' separate contention that the trial court erred in admitting redacted versions of those statements. Thus, the resolution of both issues turns on whether the redacted versions of defendants' out-of-court statements eliminated any cross-incrimination.

In *Bruton*, two defendants – Evans and Bruton – were tried jointly for robbery. Evans did not testify, but the prosecution introduced into evidence Evans's confession in which he stated he and Bruton committed the robbery. (*Bruton*, 391 U.S. at p. 124.) The trial judge instructed the jury it could consider the confession only as evidence against Evans. (*Id.* at p. 125.) The United States Supreme Court held that, despite the limiting instruction, the introduction of

48

Evans's out-of-court confession violated Bruton's Sixth Amendment right to cross-examine witnesses. (*Id.* at p. 137.)

In *Richardson v. Marsh* (1987) 481 U.S. 200 (*Richardson*), Marsh and Williams were jointly tried for murder and the prosecution introduced a redacted confession by Williams that omitted all references to Marsh and all indications that anyone other than Williams and a third person named Martin participated in the crime. (*Id.* at p. 202–203.) The trial court instructed the jury not to consider the confession against Marsh. (*Id.* at p. 205.) As redacted, the confession indicated Williams and Martin had discussed the murder in the front seat of a car while they traveled to the victim's home. (*Id.* at pp. 203–204.) However, later in the trial, Marsh testified that she was in the back seat of the car at the time. (*Id.* at p. 204.)

The Supreme Court held the redacted confession of Williams fell outside the scope of *Bruton* and was admissible (with an appropriate limiting instruction). The court distinguished the confession in *Bruton* as one that was "incriminating on its face," and had "expressly implicat[ed]" Bruton. (*Richardson*, 481 U.S. at p. 208.) By contrast, Williams's confession in *Richardson* amounted to "evidence requiring linkage" in that it "became" incriminating in respect to Marsh "only when linked with evidence introduced later at trial." (*Ibid.*) According to the court: "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Id.* at p. 211.)

In *Gray v. Maryland* (1998) 523 U.S. 185 (*Gray*), Gray and Bell were tried jointly for the murder of Stacey Williams. Bell did not testify at trial. However, the trial court permitted the prosecution to introduce a redacted version of Bell's confession. In the original, Bell indicated he, Gray and a third person, Vanlandingham, participated in the beating that led to Williams's death. The police detective who read the confession into evidence substituted the word "deleted" or "deletion" wherever the names of Gray and Vanlandingham appeared. Immediately after the redacted confession was read to the jury, the prosecutor asked, "after he gave you that information, you subsequently were able to arrest Mr. Kevin Gray; is that correct?" The officer responded, "That's correct." (*Id.* at pp. 188–189.) The prosecution produced other witnesses who said that six persons, including Bell, Gray, and Vanlandingham, participated in the beating. The trial judge instructed the jury that the confession was evidence against Bell alone. (*Id.* at p. 189.)

The Supreme Court concluded the redaction was inadequate under the circumstances because, although the names of the other participants were eliminated, the redacted version continued to refer directly to the existence of the nonconfessing defendant. (*Gray, supra*, 523 U.S. at p. 192.) The court explained: "Redactions that simply replace a name with an obvious blank space or a word such

as 'deleted' or a symbol or other similarly obvious indications of alteration . . . leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result." (*Id.* at p. 192.) According to the court: "*Bruton*'s protected statements and statements redacted to leave a blank or some other similarly obvious alteration, function the same way grammatically. They are directly accusatory. Evans' statement in *Bruton* used a proper name to point explicitly to an accused defendant . . . . The blank space in an obviously redacted confession also points directly to the defendant, and it accuses the defendant in a manner similar to Evans' use of Bruton's name or to a testifying codefendant's accusatory finger. By way of contrast, the factual statement at issue in *Richardson* – a statement about what others said in the front seat of a car – differs from directly accusatory evidence in this respect, for it does not point directly to a defendant at all." (*Id.* at p. 194.)

In *Gray*, the Supreme Court noted that *Richardson* placed outside the scope of *Bruton* those statements that incriminate inferentially. (*Gray, supra*, 523 U.S. at p. 195.) However, the court cautioned that not all such statements fall outside *Bruton*. According to the court: "[I]nference pure and simple cannot make the critical difference, for if it did, then *Richardson* would also place outside *Bruton*'s scope confessions that use shortened first names, nicknames, descriptions as unique as the 'red-haired, bearded, one-eyed man-with-a-limp,' [citation], and perhaps even full names of defendants who are always known by a nickname. This Court has assumed, however, that nicknames and specific descriptions fall inside, not outside, *Bruton*'s protection. [Citation.] . . . [¶] That being so, *Richardson* must depend in significant part upon the kind of, not the simple fact of, inference. *Richardson'*s inferences involved statements that did not refer directly to the defendant himself and which became incriminating 'only when linked with evidence introduced later at trial.' [Citation.] The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." (*Id.* at pp. 195–196.)

Defendants point to a number of statements in the redacted versions of their interview statements that, they argue, continue to implicate the others in the crimes. Thus, they contend, introduction of the redacted versions violated *Aranda/Bruton*. We shall consider the interview statements of each defendant in turn.

**Israel Sanchez**

In his interview with police, Israel initially denied ever being in Davis, but then acknowledged that he was in Davis around 11:00 p.m. in his car and saw a "drunk ass girl" come out of one of the bars. Israel told the officers the woman got in his car, asked for "weed" and then they went cruising. He initially denied having sex with her, claiming instead that he had masturbated while standing behind her. He initially denied using a condom but then said that

he had.   Later, Israel admitted lying on top of the girl and attempting to have sexual intercourse with her.   However, he claimed not to have been able to penetrate her.   Later, Israel admitted that he was able to penetrate her "a little bit."   He denied striking the woman.   Finally, Israel acknowledged that Antonio was in the car when this was occurring.

After explaining that the woman got in the car, asked for "weed," wanted to go home, but then wanted to cruise, Israel said: "So *we* cruised around in the fuckin cutties [FN1] and stuff.   After that *we* post because I guess she wanted to throw up and stuff, she wasn't feeling well so *we* got out of the car and then she was about to throw up but she didn't.   And she was just saying 'I don't feel well.'"  (Italics added.)

FN1.   The term "cutties" in this context "Refers to an area far away in distance or in the middle of nowhere."   (Urban Dict. (1999–2011) <http:// www.urbandictionary.com/define.php?term=Cutties> [as of Aug. 30, 2011].)

Defendants argue the foregoing statement implicated them because, by the time the jury heard it, evidence had already been presented that both Edgar and Alberto were also in the car with Israel, Antonio and S.L. and, therefore, they fell within the reference to "we."

It is readily clear Israel's statement that "we" cruised around and "we" got out of the car did not implicate Edgar or Alberto on its face, especially when Israel had previously indicated that both Antonio and the victim were with him in the car and he did not mention anyone else.   The fact that the statement may implicate the others, when considered in conjunction with other evidence placing Edgar and Alberto in the car, does not bring the statement within the scope of *Aranda/Bruton*.   (*Richardson, supra*, 481 U.S. at p. 208.)

Defendants contend the foregoing evidence is "remarkably similar" to that in *People v. Song* (2004) 124 Cal.App.4th 973, where this court found a violation of *Aranda/Bruton*.   Defendants are mistaken.   In *Song*, a detective testified that one defendant told him he saw a codefendant force the victim into the car.   (*Song*, at p. 979.)   The People conceded error but argued it was not prejudicial. (*Id.* at p. 981.)

*Song* is clearly distinguishable from the present matter.   In *Song*, the codefendant's statement implicated the defendant directly by name, whereas in the present matter Israel's statement did not mention the codefendants by name or suggest the presence of any unidentified perpetrators at the time of the offenses.   Only by reference to other evidence could the "we" mentioned by Israel be considered to include Edgar and Alberto.

Defendants also take issue with a statement made by Israel about smoking marijuana.   When asked how much marijuana he smoked that evening, Israel answered: "Um I think *we* had like two blunts

51

yeah *we* only had like two blunts rolled up." (Italics added.) He was then asked if he handed a blunt to S.L., and Israel answered: "No *we* were just rotating." (Italics added.)

Again, there is no direct reference to either Edgar or Alberto or any unidentified persons being present, and the "we" can easily be interpreted as referring to Israel, Antonio and S.L. Edgar and Alberto are implicated only by virtue of other evidence placing them in the car at the time. Under *Richardson*, this falls outside of *Aranda/Bruton*.

Finally, defendants take issue with a number of statements made by Israel that amounted to admissions by him that he committed the various charged crimes. For example, defendants cite Israel's admission that, while lying on top of S.L., he attempted to penetrate her for six to seven minutes. They further cite Israel's statement that S.L. told him to stop and she was too drunk to fight back. Defendants argue that, by implicating himself in a forcible rape, as alleged in count 2, Israel also implicated them as aiders and abettors in that crime as well as rape in concert, as alleged in count 3. Defendants further argue these statements negated their own assertions at trial that S.L. had gone with them voluntarily and had engaged in consensual sex.

Defendants seek to stretch *Aranda/Bruton* far beyond its legal bounds. The evil those cases seek to avoid is the admission of statements by one defendant that identify another defendant, either directly or indirectly, as having been involved in the crime without that other defendant having an opportunity to test those statements through cross-examination. *Aranda/Bruton* does not seek to keep out all statements by one defendant that might somehow prove to be harmful to another defendant once that other defendant's participation in the crimes is established through other evidence. In this instance, Israel's statements implicating himself alone would have an adverse impact on the other defendants as aiders and abettors only if Israel also identified those others as having participated. However, such participation was established through other evidence. Under *Richardson*, introduction of Israel's statements did not violate the confrontation rights of these other defendants.

* * *

**Edgar Radillo**

Edgar first denied having been in Davis at any time during the past year, but then admitted recently picking up a girl in Davis. According to Edgar, when they arrived at the crime scene, "She gets out of the car screaming" and "started tripping out saying she was going to call the cops." Edgar claimed that, after they arrived at the scene, he stayed in the car with Antonio and denied touching S.L. However, Edgar later admitted putting a condom on and intending to have sexual intercourse with her. But, according to Edgar, he changed his mind and took the condom off. He denied ever getting on top of S.L. but then admitted doing so and rubbing

his penis on her.  He at first denied penetrating S.L. but then acknowledged having done so once.  Edgar denied getting into S.L.'s purse but then admitted taking the condom from the purse.  He identified Antonio as being present and asserted that Antonio remained in the car the whole time.

After acknowledging that he picked a girl up off the street in Davis, Edgar indicated he talked to her and she said "she was going to the university or something."  The following colloquy ensued:

"DETECTIVE HERNAN OVIEDO: Okay. What else did you guys talk about in the car?

"EDGAR RADILLO: Nothing she just talked about uh well what we were going to do with our life that she had something but I don't know stuff.  She was telling me about her life.  That she don't like white guys and I don't know she was telling me.

"DETECTIVE HERNAN OVIEDO: Were you guys drinking in the car?

"EDGAR RADILLO: No she was already drunk. We didn't drink at all."

Defendants contend that, by the time Edgar's interview tape was played, the jury was already aware Alberto and Israel were in the car with Edgar, Antonio and S.L.  Thus, the foregoing implicated them in the offenses despite the use of the neutral pronoun "we."  However, as explained earlier, the fact that evidence outside of an out-of-court statement can be used to link unnamed defendants to the statement does not implicate *Aranda/Bruton*.  In the context where Edgar had just explained that he and S.L. were talking to each other in the car, the officer's questions about "you guys" and Edgar's statement that "we" didn't drink could reasonably be viewed as referring to Edgar and S.L. alone.  Only when coupled with other evidence outside the interview, are Israel and Alberto arguably implicated.

The same goes for Edgar's statement shortly thereafter about how S.L. jumped out of the car and was "tripping out:  "We were already out in the cuts[FN2] we didn't know where we going.  I don't even know the cuts.  I was lost.  And then we just ended up somewhere.  And then she started tripping out saying she was going to call the cops and I don't know."  The "we" there could easily have referred to Edgar, Antonio, and S.L., whom Edgar acknowledged were present.  Only by reference to evidence outside Edgar's interview are Israel and Alberto implicated.

FN2. In this context "cuts" means, "A term to describe a remote area that is either hidden, distant, or both."  (Urban Dict. (1999–2011) <http:// www.urbandictionary.com/define.php?term=cuts & page=2> [as of Aug. 30, 2011].)

Likewise, Edgar's statement that "[n]obody" helped S.L. out of the car and over to where she was sexually assaulted did not refer to

either Israel or Alberto and did not suggest anyone else was present besides Edgar and Antonio.

The remaining statements defendants cite as violating *Aranda/Bruton* all implicated Edgar alone in the crimes. As with Israel's statements of a similar nature, defendants argue that by implicating himself in a rape, Edgar likewise adversely impacted their consent defenses. However, as with Israel's statements, Edgar's self-implication is only adverse to Israel and Alberto if other evidence outside Edgar's interview placed them at the scene. Under these circumstances, there is no *Aranda/Bruton* error. (*Richardson, supra*, 481 U.S. at p. 208.)

**Alberto Sanchez**

Apparently, the prosecution concluded it could not redact Alberto's pretrial interview sufficiently to present it at trial. Instead, Alberto's pretrial statements were presented through the testimony of the questioning officer. Alberto admitted picking up S.L. but denied touching her. Then he admitted shaking hands with her and touching her clothing. Alberto claimed S.L. got into the car willingly and asked for marijuana. He also admitted touching a condom and a pair of panties.

Defendants contend two of Alberto's statements came in that referred to "they" as having done something, as in "they" went to the "cuties" and, as Alberto was holding S.L. up while she threw up, "they" came over. The remaining statements to which defendants object all implicated Alberto alone in the offenses, and the others by implication as aiders and abettors. However, as discussed above, none of these statements violated *Aranda/Bruton*. The use of "they" implicates the others only when coupled with evidence outside of Alberto's statements, and the self-incriminating statements do not fall within *Aranda/Bruton* even if they might ultimately harm the others.

Furthermore, Alberto eventually testified at trial and was therefore available for cross-examination by the other defendants. Defendants contend this does not matter, because at the time the officer testified about what Alberto said, Alberto had not yet testified and therefore was unavailable as a witness and could not be cross-examined on his out-of-court statements. But we fail to see what the timing of defendants' opportunity to cross-examin[e] Alberto about his out-of-court statements has to do with it. The ability to cross-examination is the ability to cross-examine, whenever it occurs. *Aranda/Bruton* is not implicated if the declarant is available at trial.

Defendants claim introduction of the pretrial interview statements of each of them violated *Crawford*, even if those statements did not implicate them directly. In *Crawford*, the United States Supreme Court "repudiated [its] prior ruling in *Ohio v. Roberts* (1980) 448 U.S. 56, under which an unavailable witness's statements were admissible against a criminal defendant if the statement bore 'adequate "indicia of reliability."' [Citation.] . . . *Crawford* held that

54

1
2
3
4

> out-of-court statements by a witness that are testimonial are barred under the Sixth Amendment's confrontation clause unless the witness is shown to be unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the trial court." (*People v. Monterroso* (2004) 34 Cal.4th 743, 763.)

5
6
7
8
9
10

> There is no question the interview statements of defendants were testimonial within the meaning of *Crawford* and, at least as to Edgar and Israel, the declarants were unavailable as witnesses. However, "*Crawford* addressed the introduction of testimonial hearsay statements against a defendant." (*People v. Stevens* (2007) 41 Cal.4th 182, 199, italics added.)   As explained above, none of defendants' interview statements admitted at trial contained evidence against any of the others.  Thus, they did not implicate the confrontation clause.  (*Ibid.*) "The same redaction that 'prevents *Bruton* error also serves to prevent *Crawford* error.'"   (*Ibid.*; *accord, People v. Song, supra*, 124 Cal.App.4th at p. 984.)

11    *Sanchez*, 2011 WL 3806264, at **12-19.

12         Petitioner takes issue with the California Court of Appeal's conclusion that use of the

13    word "we" by Israel Sanchez and Edgar Radillo did not necessarily refer directly to the other two

14    co-defendants in the car and could have referred to the victim or Antonio.  ECF No. 1-1 at 125.

15    Petitioner argues that Israel and Edgar's statements were read to the jurors after they had heard

16    testimony that there were five persons in the car: himself, Edgar, Israel, Antonio, and S.L.  *Id.*  He

17    argues, "the jury could not avoid inferring that the pronoun 'we' used in the statements referred to

18    petitioner."  *Id.*

19         Petitioner concedes that, as pointed out by California Court of Appeal, the jury "had to

20    consider other evidence to infer that petitioner was among those present with Israel and Edgar

21    during the events they described."  *Id.*  Yet, he argues that in similar circumstances other courts

22    have found a violation of the Sixth Amendment where the jury could not help but infer that

23    statements made by co-defendants referred to the defendant.  *Id.* at 126.  He argues that, in this

24    case, "by the time Israel's and Edgar's statements were played, the jury knew immediately that

25    references to 'we' included petitioner in the events described in the statements."  *Id.*

26         Petitioner also argues that the limiting instruction given by the trial court was incorrect

27    and confusing, and was not sufficient to instruct the jury not to use the statements of his co-

28    defendants against him.  He notes that the limiting instruction read as follows: "You have heard

1    evidence that the defendants made statements out of court and before trial.  You may consider

2    that evidence only against the *declarant* and not against any other defendant."  CT at 978.

3    However, immediately preceding the introduction into evidence of the audiotapes containing

4    Israel and Edgar's police statements, the trial court misread the instruction and informed the jury

5    that "these statements may be used as evidence only against the *defendant* and not against other

6    defendants."  RT at 1301, 1303.  Petitioner argues it is not clear that "defendant" in this context

7    refers to "declarant."  ECF No. 1-1 at 125.  This limiting instruction was correctly conveyed to

8    the jury later during the closing jury instructions.  However, petitioner argues that "by the time

9    the jury was told not to use the statements against petitioner, it was too late, the damage had been

10   done."  *Id.*

11          Petitioner argues that the Sixth Amendment violation that occurred in this case was

12   prejudicial.  *Id.* at 127.  He contends that the extrajudicial statements of Edgar Radillo and Israel

13   Sanchez were necessary to establish all the elements of the crimes charged in counts one, three

14   and five (the kidnapping and rapes by Edgar and Israel, of which petitioner was convicted as an

15   aider and abettor or co-conspirator) and count eight (the sexual battery committed by Edgar, of

16   which petitioner was also convicted as an aider and abettor or co-conspirator).  *Id.*  at 117, 127-

17   30.  He argues that Israel's and Edgar's pretrial statements "were required to 'fill in the blanks'"

18   with respect to these counts.  *Id.* at 129.

19                        **2.  Applicable Legal Standards**

20                            **a.  Severance**

21          A court may grant habeas relief based on a state court's decision to deny a motion for

22   severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial.

23   *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993) (court must decide if "there is a serious risk

24   that a joint trial would compromise a specific trial right of one of the defendants, or prevent the

25   jury from making a reliable judgment about guilt or innocence"); *United States v. Lane*, 474 U.S.

26   438, 446 n.8 (1986) ("misjoinder would rise to the level of a constitutional violation only if it

27   results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial");

28   *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991) (same); *see also Comer v. Schiro*,

1    480 F.3d 960, 985 (9th Cir. 2007) (in the context of the joinder of counts at trial, habeas relief

2    will not be granted unless the joinder actually rendered petitioner's state trial fundamentally

3    unfair and therefore violative of due process).  Petitioner bears the burden of proving that the

4    denial of severance rendered his trial fundamentally unfair,  *Grisby v. Blodgett*, 130 F.3d 365, 370

5    (9th Cir. 1997), and must establish that prejudice arising from the failure to grant a severance was

6    so "clear, manifest, and undue" that he was denied a fair trial.  *Lambright v. Stewart*, 191 F.3d

7    1181, 1185 (9th Cir. 1999) (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1071-72 (9th

8    Cir. 1996)).  On habeas review, federal courts neither depend on the state law governing

9    severance, *Grisby*, 130 F.3d at 370 (citing *Hollins v. Dep't of Corrections, State of Iowa*, 969

10   F.2d 606, 608 (8th Cir. 1992)), nor consider procedural rights to a severance afforded to criminal

11   defendants in the federal criminal justice system.  *Id.*  Rather, the relevant question is whether the

12   state proceedings satisfied due process.  *Id.*; *see also Cooper v. McGrath*, 314 F. Supp. 2d 967,

13   983 (N.D. Cal. 2004).

## b. <u>Right to Confrontation</u>

15         The Sixth Amendment to the United States Constitution grants a criminal defendant the

16   right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The 'main and

17   essential purpose of confrontation is to secure for the opponent the opportunity of cross-

18   examination.'"  *Fenenbock v. Director of Corrections for California*, 692 F.3d 910, 919 (9th Cir.

19   2012) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)).  The Confrontation Clause

20   applies to the states through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 406

21   (1965).

22         In 2004, the United States Supreme Court held that the Confrontation Clause bars the state

23   from introducing into evidence out-of-court statements which are "testimonial" in nature unless

24   the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness,

25   regardless of whether such statements are deemed reliable.  *Crawford v. Washington*, 541 U.S. 36

26   (2004).  The *Crawford* rule applies only to hearsay statements that are "testimonial" and does not

27   bar the admission of non-testimonial hearsay statements.  *Id.* at 42, 51, 68.  *See also Whorton v.*

28   *Bockting*, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application to" an "out-of-

1   court nontestimonial statement.")  Although the *Crawford* court declined to provide a

2   comprehensive definition of the term "testimonial," it stated that "[s]tatements taken by police

3   officers in the course of interrogations are . . . testimonial under even a narrow standard."

4   *Crawford*, 541 U.S. at 52.

5          In *Bruton v. United States*, 391 U.S. 123 (1968), the United States Supreme Court held

6   that a defendant is deprived of his Sixth Amendment right of confrontation when a facially

7   incriminating confession of a non-testifying co-defendant is introduced at their joint trial, even if

8   the jury is instructed to consider the confession only against the co-defendant.  391 U.S. at 135.

9   "Under *Bruton* and its progeny 'the admission of a statement made by a non-testifying

10  codefendant violates the Confrontation Clause when that statement facially, expressly, or

11  powerfully implicates the defendant.'"  *United States v. Hernandez-Orellana*, 539 F.3d 994, 1001

12  (9th Cir. 2008) (quoting *United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir. 2007)).  *Bruton*

13  presented a "context[ ] in which the risk that the jury will not, or cannot, follow instructions is so

14  great, and the consequences of failure so vital to the defendant, that the practical and human

15  limitations of the jury system cannot be ignored."  *Id.* at 135.

16         *Gray v. Maryland*, 523 U.S. 185 (1998), extended *Bruton* to a codefendant's confession,

17  under similar joint-trial circumstances, that was "redacted . . . by substituting for the defendant's

18  name in the confession a blank space or the word 'deleted.'"  *Gray*, 523 U.S. at 188.  The

19  Supreme Court held that these redactions made no constitutional difference.  *Id.*  However, in

20  *Richardson v. Marsh*, 481 U.S. 200 (1987), the Supreme Court held that the admission of a

21  nontestifying codefendant's confession did not violate the defendant's rights under the

22  Confrontation Clause where the trial court instructed the jury not to use the confession in any way

23  against the defendant, and the confession was redacted to eliminate not only the defendant's

24  name, but any reference to her existence.

25         Confrontation Clause violations are subject to harmless error analysis.  *Whelchel v.*

26  *Washington*, 232 F.3d 1197, 1205-06 (9th Cir. 2000).  "In the context of habeas petitions, the

27  standard of review is whether a given error 'had substantial and injurious effect or influence in

28  determining the jury's verdict.'"  *Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir. 1994) (quoting

1   *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Factors to be considered when assessing the

2   harmlessness of a Confrontation Clause violation include the importance of the testimony,

3   whether the testimony was cumulative, the presence or absence of evidence corroborating or

4   contradicting the testimony, the extent of cross-examination permitted, and the overall strength of

5   the prosecution's case.  *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).[5]

6            **3. Analysis**

7            Petitioner claims that the trial court violated his rights under the Confrontation Clause by

8   admitting into evidence the police statements of Edgar Radillo and Israel Sanchez, wherein they

9   referred to the people in the car as "we" and made other statements that provided crucial evidence

10  to support the kidnapping, rape and sexual battery charges.  Petitioner argues that it was clear to

11  the jury that the pronoun "we" included him.  As set forth above, the California Court of Appeal,

12  in a thorough analysis, concluded that the admission of Sanchez and Radillo's statements did not

13  violate the Confrontation Clause because they implicated petitioner only when coupled with other

14  evidence outside of those statements.  The state court concluded that the word "we" could have

15  been interpreted by the jury to refer to Radillo, S.L., and Antonio, who the jurors were already

16  aware were in the car, and that the other incriminating statements  only implicated petitioner in

17  the crimes because his participation had been established by other evidence.  These conclusions

18  by the Court of Appeal are based a reasonable interpretation of the facts of this case and are not

19  contrary to or an unreasonable application of the holdings in *Bruton*, *Richardson*, and *Gray*.

20           Further, unlike the situation in *Gray*, the statements of Edgar Radillo and Israel Sanchez

21  were not altered by the trial court to insert a pronoun for petitioner's name.  Rather, their

22  statements were introduced as they spoke them, with any reference to petitioner being supplied by

23  other evidence outside of those statements.  In addition, petitioner's jury received a limiting

24  instruction that informed the jurors the admitted statements could only be considered against the

25  declarant and not against any other defendant.  Although the trial judge originally misspoke when

26

27           [5] Although *Van Arsdall* involved a direct appeal and not a habeas action, "there is nothing
    in the opinion or logic of *Van Arsdall* that limits the use of these factors to direct review."
28  *Whelchel*, 232 F.3d at 1206.

1  delivering this instruction, substituting the word "defendant" for the word "declarant," the error

2  was corrected during the formal recitation of jury instructions.  The decision of the California

3  Court of Appeal that, under these circumstances, the admission of Edgar and Israel's statements

4  did not violate petitioner's rights under the Confrontation Clause is not unreasonable and is not

5  "so lacking in justification that there was an error well understood and comprehended in existing

6  law beyond any possibility for fairminded disagreement."  *Richter*,131 S. Ct. at 786-87.

7  Accordingly, petitioner is not entitled to habeas relief on this claim.[6]

8          Because there was no Confrontation Clause error at petitioner's trial, the trial court did not

9  violate petitioner's federal constitutional rights in denying petitioner's motion to sever his trial

10  from that of his co-defendants.  The joint trial was not "so prejudicial that it denied a petitioner

11  his right to a fair trial.  *Zafiro*, 506 U.S. at 538-39.  Accordingly, petitioner is not entitled to relief

12  on his severance claim.

13  **IV. Conclusion**

14          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

15  habeas corpus be denied.

16          These findings and recommendations are submitted to the United States District Judge

17  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

18  after being served with these findings and recommendations, any party may file written

19

20  ───────────────────────

21          [6]  Because the trial court did not commit error under *Bruton* in admitting the statements of
    Edgar Radillo, there is no *Crawford* error.  *See, e.g., United States v. Rakow*, 286 F. App'x 452,

22  454 (9th Cir. 2008) (court denies *Crawford* violation where prior testimony of co-defendant was
    admitted against co-defendant, because ". . . absent *Bruton* error, *Crawford* has no work to do in

23  this context . . . .") (citing *United States v. Johnson*, 297 F.3d 854, 856 n. 4 (9th Cir. 2002);
    *United States v. Chen*, 393 F.3d 139, 150 (2d Cir. 2004) (the same factual circumstances

24  surrounding admission of co-defendant's statement "that prevent *Bruton* error also serves to
    prevent *Crawford* error."); *United States v. Gould*, No. CR 03–2274 JB, 2007 WL 1302593, at *3

25  (D.N.M. Mar. 23, 2007) ("If a limiting instruction is given to the jury, a properly redacted
    statement of a co-defendant, one that satisfies *Bruton* . . . , does not raise a Confrontation Clause

26  issue pursuant to *Crawford* . . ., because such a statement is not offered against the defendant.");
    *Bolus v. Portuondo*, No. 9:01–CV–1189, 2007 WL 2846912, at *21 (N.D.N.Y. Sept. 26, 2007)

27  ("Since this court finds no *Bruton* error, there would be no *Crawford* error, even if *Crawford*
    were applicable.").

28

60

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, *Rules Governing Section 2254 Cases* (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  May 21, 2015.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE